## W. R. SMITH & SONS, Limited, v. SUSQUEHANNA S. S. CO

(District Court, D. Maryland. September 2, 1922.)

No. 836.

1. Shipping ⊂⇒58(2)—Evidence held to prove that charterer excused owner's tender of ship.

In steamship owner's action against charterer for breach of charter, defended on the ground of owner's failure to tender steamships for voyage, evidence *held* to show that charterer expressly excused the owner from tendering ships.

2. Shipping ⊂⇒52.—Owner not required to tender ships, where charterer had admitted inability to load ships, if tendered.

Where charterer admitted, before time for delivery of ships, that it would not be able to load ships, if tendered, the owner was not required to tender ships as a condition to recovering damages for charterer's breach of charter.

3. Shipping ⊂⇒58(3)—Measure of damages for charterer's breach stated.

Shipowner's measure of damages for charterer's failure to load ships was the difference between what the ships would have earned under the charter and what they did in fact earn, or by the exercise of reasonable diligence on the part of the owner would have earned, during the charter period.

In Admiralty. Libel by W. R. Smith & Sons, Limited, against the Susquehanna Steamship Company. Judgment for libelant.

Charles R. Hickox and Kirlin, Woolsey, Campbell, Hickox & Keating, all of New York City, and Stuart Janney and Janney, Stuart & Ober, all of Baltimore, Md., for libelant.

George Forbes, of Baltimore, Md., and Cass & Apfel, of New York City, for respondent.

ROSE, District Judge. In this proceeding, the libelant, W. R. Smith & Sons, Limited, a British corporation, hereinafter called the owner,

seeks to recover from the respondent, the Susquehanna Steamship Company, a body corporate of the state of New York, referred to herein as the charterer, damages for the breach of the charterer's obligations under three several charters, each for a separate steamship to carry coal from this country to Europe. The charters were all made in June, 1920. The steamers were to go into the service of the charterer at various dates from June 25 to August 20, and to remain in it until April 30, 1921. Not a single cargo was ever furnished.

In its answer the charterer sets up various justifications or excuses for its failure to do so, but at the hearing it appeared that the only questions in dispute were whether the charterer had expressly excused the owner from tendering the ships for the voyages subsequent to the first, and, if it had not, what legal consequences followed. No such tenders were ever made, but the owner says that the charterer told it that they need not be. This the charterer denies. Four witnesses, who were present at the interview at which it is said the charterer's representative told the agent of the owner that it was useless to tender the ships, have been examined. One of them, an officer of the charterer, says it never waived the owner's obligation to tender, and on this he is supported by a lawyer, who had at the time been lately called into the matter by the charterer, and who testifies that, while he cannot recollect what was said, he is sure that, in view of the position his client was then taking, no waiver was made. They are contradicted, not only by the owner's American representative, but by the eminent member of the admiralty bar who, until a short time before, had had entire charge of charterer's side of the controversy, and who was still acting for it.

At the hearing before me it was strenuously insisted that, as the charterer had hired the ships to enable it to perform a contract it had with a concern known as the Emmons Coal Mining Company, hereinafter shortly styled the Emmons, and that, as it was the inability of the Emmons to furnish coal which caused the whole trouble, it is not likely that it would have excused the owner from tendering the ships, which, in its turn, it had to offer to the Emmons to preserve its rights against the last named.

[1] This contention is not without force, and at first the course of the charterer was doubtless controlled by the considerations now so strongly emphasized; but by October, when the final waiver was made, other things had to be taken into account. Freight rates had in the meantime fallen with great and perhaps unprecedented rapidity. There was every indication that they would go still lower, as in fact they did. The Emmons was in deep water financially. A claim against it, however large and however indisputable, might be worth little. To compel the owner to send its ships to this side of the Atlantic, to go through what everybody knew would prove a mere form, might and doubtless would have added many thousands of dollars to the owner's rightful demand against the charterer. Moreover, the charterer was not bound to the Emmons to furnish it with any particular ships. Its obligations could as well be performed by the tender of any other suitable vessels, and the Atlantic ports were at the time crowded with such.

Under such conditions, good judgment might well have led the charterer to say, as I find as a fact it did in substance say to the owner:

"Do not waste time and money in an idle gesture. We cannot use the ships. Get as much net out of them as you can, and thereby minimize the loss which must be borne by one of us."

[2] Moreover, under all the circumstances, was the owner bound to make such tender? It is true that the failure to provide cargo for the first voyage would not, under the terms of the charter party, have excused performance by the owner of the obligations as to those subsequently to be made, but the admission of the charterer that it would not be able to load the ships if they were tendered for such voyages would. No one can read the testimony without seeing that, before the time for such tenders came, everybody knew that the charterer would not and could not load them. With such information given it by the charterer, surely the owner was not bound to go through a useless, but very costly, form, merely because its doing so might help the charterer in some controversy with a third party, with whom the owner never had any relation of any kind.

[3] It follows that the owner is entitled to recover against the charterer the difference between what the ships would have earned under the charter, and what they did in fact earn, or by the exercise of reasonable diligence on the part of the owner would have earned, during the charter period. If the parties cannot agree as to this amount, or reduce the disputed questions concerning it to such a compass as will enable me to dispose of them without undue consumption of court time, a reference to ascertain it will have to be made.