## SPANISH AMERICAN LINE, Inc., v. BAUGH CHEMICAL CO.

### No. 1790.

District Court, D. Maryland.
Jan. 31, 1931.

Niles, Barton, Morrow & Yost, of Baltimore, Md., for libelant.

Janney, Ober, Slingluff & Williams, of Baltimore, Md., for respondent.

SOPER, District Judge.

The Spanish American Line, Incorporated, as owner of the steamship Nord and the steamship Dago, brings this libel against the Baugh Chemical Company, complaining of the breach by the latter of a charter party of October 4, 1929, wherein the respondent engaged to charter from the libelant the Dago or substitute to carry a cargo of fertilizer from Baltimore, Md., to Halifax, Nova Scotia. The charter contained the following provision:

"Lay-days, if required by charterers, not to commence before January 15, 1930, and should the steamer not be ready for cargo at her loading port on or before February 15, 1930, the charterers or their agents to have the option of cancelling this charter party at any time not later than the day of steamer's readiness."

The libel further alleged that on January 15, 1930, the shipowner named the steamship Nord to fulfill the charter party, and advised the shipper that the steamship would be ready to load on Saturday, January 25, 1930, or Monday, January 27, 1930. Subsequent thereto, certain letters were exchanged between the parties which, by stipulation, are to be considered as part of the libel, and which disclose the following transactions: On January 17, 1930, the shipper wrote to the shipowner acknowledging the nomination of the steamship Nord under the terms of the charter party, and stated that it was impossible for the consignees of the cargo at that time to receive the cargo on the steamship Nord, and hence it was impossible for the shipper to load the vessel. The letter stated:

"Therefore, as telephoned you, it will be impossible for us to load this vessel for them, and they advise us that it will be about the middle of February before they will want us to load vessel.

"It is our understanding that you will take this matter up with the Spanish American Line and have them divert this steamer on other business."

In reply thereto the shipowner wrote on January 18 that it would charter the vessel for other business, but would be obliged to hold the shipper responsible for any loss that the shipowner might suffer by reason of the shipper's failure to load the steamer, according to the terms of the charter. The owner added that it had practically fixed the steamer for another cargo, and that the approximate amount of the damages would be about $600, and that a complete statement as to the difference in earnings would be submitted as soon as possible.

On January 20, 1930, the shipper protested against this action in a letter which contained the following statements:

"In our charter, we asked for loading between January 15th and February 15th.

From the conversation with Mr. Jack (Consignee's Agent), over the telephone, it seems very evident that before February 15th he will be able to let you put a vessel in to load this cargo.

"This is our first dealings with you but as we expect to be shipping to Mr. Jack regularly from season to season, it seems to us that aside from any legal aspects in the case, that you should cooperate with us by putting in a vessel at a suitable time within the dates mentioned, especially in view of the fact that Mr. Jack advised you of this business after he contracted with us. * * *

"It may be that when the Nova Scotia Chemical Company hear from you that they will be able to make some arrangements to take the boat in earlier."

By reason of the correspondence, the steamship Nord did not proceed to Baltimore and was not actually tendered to the charterer. On January 27, 1930, the shipowner again named the steamship Nord to fulfill the terms of the charter, but the charterer notified the shipowner that it was still unable to load the steamer for the same reasons as existed on January 15. Subsequently the steamer was chartered to other persons at a lower freight rate, resulting in a loss to the shipowner of approximately $1,010.

On February 3, 1930, the shipowner wrote to the shipper stating that it did not agree with the reasons advanced by the shipper in its letter of January 20 as to why it should not be forced to load the steamer, according to the terms of the charter party, and referred to the fact that the steamship Nord had been delayed, and again offered to the shipper at a later date, which, however, the shipper did not meet. The letter contained the following statement:

"This is to notify you that we have now fixed this steamer at a lower rate of freight than called for in our charter party with the Baugh Chemical Co., and furthermore have had to agree to lay days which will necessitate steamer waiting for cargo at least three days. Our damages, therefore, for failure of the Baugh Chemical Co. to load in accordance with the terms of our charter party will amount to approximately $1010."

The letter also made some suggestions for the settlement of the controversy.

On February 8, 1930, the shipowner named the steamship Dago to load under the charter and notified the shipper that the steamship was on its way to Baltimore and would be ready to load about February 10, 1930. Thereupon the steamship proceeded to Baltimore, and on February 11, 1930, was formally tendered to the charterer, but it declined and refused to accept or load the vessel in accordance with the charter.

The damages claimed in the libel are based upon the refusal of the charterer to accept and load the steamship Dago and the failure of the charterer to pay to the shipowner the loss incurred by it in complying with the request of the charterer to withdraw the nomination of the steamship Nord. In short, the libel claims damages in the sum of $6,000, which seem to cover not only damages suffered by the shipowner from the refusal of the charterer to load the steamship Dago when tendered, but also the difference between the charter hire, specified in the charter, and that received by the shipowner in the recharter of the steamship Nord.

The shipowner has filed exceptions to the libel on the ground that the damages arising from breach of charter party should be limited to those consequent upon its repudiation of the contract when the steamship Nord was nominated on January 15, 1930, and consequently that it is not responsible for such additional damages as may have been incurred by reason of the renomination of the steamship Nord on January 27, and the nomination of the second steamship, the Dago, on February 8.

The substantial question in the case is whether the circumstances show such a repudiation of the contract of charter party by the shipper by its letter of January 17, 1930, as to constitute a total breach of the contract. It is the contention of the shipowner that the refusal of the shipper was not sufficiently certain and positive as to amount to an anticipatory breach; and that therefore it had the right, if not the obligation, to make the subsequent tender of the Dago. The rule as to what constitutes an anticipatory repudiation of contract under circumstances similar to those in the case at bar is set out in Tentative Draft No. 7, section 310, of the Restatement of the Law of Contracts of the American Law Institute published on March 1, 1930, wherein it is said that, amongst others, the following act will constitute an anticipatory repudiation which is a total breach of contract:

"A positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties."

This rule has been strictly applied in cases of charter party, and it has been held, if

the repudiation is not positive and conditional, a tender of a ship must be made, even though there are circumstances which lead the shipowner to believe that the charterer intends to break the contract. W. R. Smith & Sons v. Susquehanna S. S. Co. (D. C.) 282 F. 881; Hasler v. West India S. S. Co. (C. C. A.) 212 F. 862; Dingley v. Oler, 117 U. S. 490, 6 S. Ct. 850, 29 L. Ed. 984.

■ Upon the argument of the case, it was conceded that the libelant was not entitled both to damages for the failure of the charterer to accept the steamship Nord and also to damages for its failure to accept the steamship Dago. But the libelant still contends that it is not restricted to the damages incurred in respect to the first named steamship, but may recover the larger damages which followed the refusal by the charterer of the second ship. Bearing in mind the strictness of the rule, the libelant points to those phrases in the letters of January 17 and January 20, wherein the charterer indicated a possibility that the consignee could take the cargo at a later date before February 15, 1930. These phrases undoubtedly indicate the possibility that the charterer might be able to accept a vessel before the expiration of the period ending on February 15, 1930; but at the same time, the correspondence clearly shows that the charterer positively and unconditionally indicated that it would refuse the steamship Nord if tendered according to the first nomination on January 25 or 27, or according to the second nomination, if tendered on or about February 3. The charterer's letter of January 20 does not in any way qualify the earlier definite refusal of the charterer to load the Nord, in case she should be tendered on January 25 or 27. On the contrary, this letter in effect requests that the shipowner waive the breach of the contract which the charterer had committed, and suggests that the shipowner put in another vessel at a suitable time between January 15 and February 15, evidently meaning that the time should be one convenient to the consignee of the cargo.

In order to measure the rights of the parties under these circumstances, it is necessary to keep in mind the fact that it was not the privilege of the charterer under the contract to demand a vessel at any time between January 15 and February 15, as its business convenience might require. On the contrary, it was contemplated that the shipowner might furnish the vessel at any time on or after January 15, until on or before February 15, 1930, at the port of Baltimore; and if at any time within this period a vessel was ten-

dered, it became the contractual obligation of the charterer to load it within the lay days specified in the contract. Consequently the shipowner would have performed its entire obligation had it tendered the steamship Nord on January 25 or January 27, as it offered in the first instance to do; and it was excused from the actual tender of the vessel when it was unconditionally informed by the charterer that it was impossible for it to load the vessel on either of these days. It was under no obligation to make additional nominations or tenders of this or any other vessel at any subsequent time between January 15 and February 15, 1930. It follows that the shipowner was well within its rights when, after the receipt of the charterer's letter of January 17, it notified the charterer that the vessel would be diverted for other purposes and the charterer would be held responsible for any loss of charterhire. So far as one can tell from the correspondence, it would seem that the shipowner first endeavored to secure a cargo of coal for the steamship Nord at a price which would have limited its damages to $600, and failing this, again offered the vessel on January 27 to the charterer. When it was again refused, it entered into a charter party at a price which fixed its damages at $1010.

The libelant argues that the second offer of the vessel by the shipowner indicates that it did not regard the repudiation by the charterer as final and unconditional. Smoot's Case, 15 Wall. 36, 48, 21 L. Ed. 107, is cited for the following passage quoted with approval from Benjamin on Sales:

"A mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient; it must be a distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made; for if he afterwards continue to urge or demand a compliance with the contract, it is plain that he does not understand it to be at an end."

■ The actual facts of the cited case are so different in legal import and effect from those in the case at bar that the decision has little relevance to the point at issue. It is of course true that the communications and conduct of the parties before and after the act of repudiation should be considered in determining its character and effect, and it may be that in some cases a subsequent effort or attempt on the part of the injured party to secure compliance with the contract may indicate that a repudiation was not unequivocal

and final. But no such conclusion can fairly be drawn in this case. The efforts on the part of the shipowner to charter the vessel elsewhere and pending the consummation of such a contract, to give the charterer another opportunity to comply with the terms of the charter, do not weaken the effect of the positive statement of the charterer that it would not accept the vessel if offered. The second unconditional refusal of the Nord merely served to strengthen the first.

But the libelant says that even if there was a positive and final breach of the contract, it still had the option to regard the contract as in existence; and since it had the right to tender a vessel at any time between January 15 and February 15, it was justified in tendering the steamship Dago on February 11, even after the steamship Nord had been refused. It relies particularly on the case of The Adamello (C. C. A.) 23 F.(2d) 579, 1928 A. M. C. 301. But that case is of little assistance here. It was brought by the libelant on the theory that the other party to the contract had repudiated it, and after suit was brought, the parties entered into a new arrangement, the effect of which was to restore the terms of the original contract. The court held that the repudiation, although taken as final by the libelant, was in fact not positive and unconditional, and the rights of the parties were adjudged on that theory. It is not the law that one against whom a breach of contract has been committed has the option of regarding the contract as still in existence for all purposes, notwithstanding a definite and unequivocal repudiation. The rights of the injured party in the case of an anticipatory breach are stated in Williston on Contracts, § 1337, as follows:

"To rescind the contract altogether, and if any performance has already been rendered by the injured party, to recover its value on principles of quasi-contract, to elect to treat the repudiation as a breach, either by bringing suit promptly, or by making some change of position, or to await the time for performance of the contract and bring suit after that time has arrived. Even if the plaintiff thus elects to wait until the stated time for performance, he will be excused from the necessity of performing or being ready to perform on his own part unless the repudiating party withdraws his repudiation before a change of position by the injured party makes this performance more burdensome. Indeed the injured party has no right to perform, if, by so doing, damages will be enhanced."

If the position of the libelant in this case were sustained, it would be necessary to add another option to those outlined in the passage quoted; for the libelant in this case contends that in spite of a positive repudiation of the contract, it had the right to continue to perform acts which it would be required to do for the full performance of the contract, that is, actually to tender at Baltimore a vessel to carry the cargo. Obviously this would involve additional expense and damage and would be quite contrary to the statement of Professor Williston that the injured party has no right to perform if by so doing damages will be enhanced. Indeed, such conduct would be quite contrary to the general theory of damages, and the duty of the injured party to minimize rather than increase them. It is stated in Williston on Contracts, § 1298, as follows:

"There is a line of cases running back to 1845 which holds that after an absolute repudiation or refusal to perform by one party to a contract, the other party cannot continue to perform and recover damages based on full performance. This rule is only a particular application of the general rule of damages that a plaintiff cannot hold a defendant liable for damages which need not have been incurred; or, as it is often stated, the plaintiff must, so far as he can without loss to himself, mitigate the damages caused by the defendant's wrongful act. The application of this rule to the matter in question is obvious. If a man engages to have work done, and afterwards repudiates his contract before the work has been begun or when it has been only partially done, it is inflicting damage on the defendant without benefit to the plaintiff to allow the latter to insist on proceeding with the contract. The work may be useless to the defendant, and yet he would be forced to pay the full contract price. On the other hand, the plaintiff is interested only in the profit he will make out of the contract. If he receives this it is equally advantageous for him to use his time otherwise."

It is clear, from the above recital of facts, that when the charterer refused the nomination of the Nord for January 25 or January 27, the shipowner accepted this action as a final repudiation of the contract. The contract was then at an end. The charterer had no right to withdraw its repudiation and to require the tender of another steamship after the shipowner had acceded to the repudiation and had changed its position by chartering the boat for another cargo. On the other hand, the shipowner had no right to hold a ship or ships in readiness and in idleness dur-

ing the entire period of thirty days without an effort on its part to seek other profitable employment and at the end of the time, to charge the charterer with the damages thereby incurred.

It is the conclusion of the court that the exceptions in this case should be sustained in so far as the libel attempts to set up a cause of action arising out of the refusal of the charterer to accept the steamship Dago on February 11; but the exceptions should be overruled in so far as they relate to the claim of the shipowner for the sum of $1,010 representing the difference between the price named in the charter party and the proceeds of the recharter of the steamship Nord after its second nomination on January 27. So far as one can tell from the allegations of the libel, taken in connection with the correspondence filed as a part thereof, the recharter of the boat at a loss of $1,010 was the first available employment which the shipowner was able to secure after the charterer's repudiation of the contract. There is mention in the letter of January 17 of estimated damages of $600 on the assumption that the boat would be chartered for a cargo of coal; but it does not appear that this charter was effected, and in the present state of the pleadings, the shipowner is entitled to such damages as were caused by the charterer's failure to accept and load the first steamer.