**REDERI A/B PULP, Rederi A/B Jamaica, D/S A/S Eikland and Salamis, A/S, joint venturers doing business under the trade name and style of Salenskaugen Line, and of A/S Igadi, Libelants,**

v.

**REPUBLIC CHEMICAL CORPORATION, Respondent and Impleading Petitioner, Mathieson Chemical Corporation, Impleaded Respondent.**

United States District Court
S. D. New York.
March 17, 1958.

Haight, Gardner, Poor & Havens, New York City, for libelants, Tallman Bissell, Karl V. Kerth, Thomas R. H. Howarth, New York City, of counsel.

Alfred S. Julien, New York City, for respondent.

Cravath, Swaine & Moore, New York City, for impleaded respondent, John J. O'Connell, George S. Parlin, Jr., New York City, of counsel.

McGOHEY, District Judge.

The libelants sue to recover dead freight claimed to be due because of Re-public's alleged breach of two contracts to furnish cargoes of superphosphate for the vessels Knut Bakke and Igadi on voyages from the United States to Korea.

Republic challenges the libelants' standing to maintain the suit; admits negotiating for use of the vessels but denies that contracts resulted; asserts that if they did, the failure to. load pursuant thereto was caused by the vessels' departure before expiration of their respective lay days which it is contended were, pursuant to the terms of the alleged contracts, extended because of rain.

Republic by impleading petition also seeks, if held liable, to be indemnified by Mathieson. The ground of this claim is that, if Republic breached contracts respecting the vessels, this was caused by Mathieson's breach of the loading time arrangements made under a contract between it and Republic for the purchase by the latter of superphosphate which Mathieson was to deliver at its dock in Baltimore on ships to be provided by Republic.

Mathieson admits its contract with Republic. It admits also that the above named vessels which Republic proposed for loading at specified times were not loaded. This, it asserts, did not constitute a breach by Mathieson because the vessels were sent to Baltimore for loading at times not previously agreed to by Mathieson as required by its contract with Republic, and, in any event, the vessels left Baltimore, without notice to Mathieson, before expiration of their respective lay days as extended because of rain.

### Findings.

1. The libelants Rederi A/B Pulp and Rederi A/B Jamaica, Swedish corporations managed by Sven Salen, and libelants D/S A/S Eikland and Salamis A/S, Norwegian corporations managed by Brin Skaugen, were the time-chartered owners of the Knut Bakke. They operated this vessel in their liner service from the United States to the Far East under the trade name Salen-Skaugen Line. The general agent in the United States for the management and operation

of this service was Interocean Steamship Corporation.

2. The libelant A/S Igadi, a Norwegian corporation, was the owner of the Igadi, which it operated in its liner service from the United States to the Far East. Its general agent in the United States for the management and operation of such service was Stockard & Company, Inc.

3. Republic Chemical Corporation was engaged in the purchase and sale of chemical products.

4. Olin Mathieson Chemical Corporation was engaged in the manufacture and sale of chemical products.

5. Republic and Mathieson are, respectively, corporations of New York and Maryland.

6. Early in January, 1950, Republic was the successful bidder, in competition with Mathieson, for a contract to sell the United States 20,000 tons of superphosphate. The contract provided: "Delivery: February/March 1950. Shipment on other than American Flag ships not permitted unless approved (in writing) by this office. Delivery Pusan, Korea subject to diversion other South Korean port."

7. When Republic entered into this contract it did not have superphosphate on hand and had no arrangement for its carriage to Korea.

8. On January 17, 1950, Republic entered into a contract to purchase the 20,000 tons of superphosphate from Mathieson at the price the latter had offered to the Government.

9. Negotiations which preceded this contract were conducted for Mathieson by its Director of Foreign Trade, one Vreeland. Republic's representative was one Greenfield. Vreeland informed Greenfield of the fact that Mathieson had only one dock at Baltimore; that it was used to discharge ships bringing raw material to the plant as well as to load shipments of finished products on outgoing vessels; that but one ship could be berthed there at a time; that the dock worked on a very close schedule and accordingly it would be necessary "to correlate the shipping arrangements with our dock's availability." The contract which resulted from their negotiations provided: "Delivery: January/February/March. Shipping details to be arranged between Mathieson and Republic on a mutually satisfactory basis. Republic agrees to provide vessels, satisfactory for bulk stowage and acceptable to Mathieson, and Mathieson agrees to load an average minimum of 1,000 metric tons * * * per weather working day, Sundays and holidays excepted; and Mathieson agrees to pay demurrage at the rate of $1,000 daily if this loading schedule is not met. First vessel is tentatively scheduled for loading between February 1st and 15th."

10. When the foregoing contract was entered into Mathieson was under contract with other purchasers, including the United States Government, to deliver superphosphate at the Baltimore dock on board vessels provided by the purchasers. This was known to Republic.

11. It is conceded, and in any event the evidence proves, that during February and March Mathieson delivered 20,000 tons of superphosphate in four lots which were loaded respectively on the vessels Fernland, Fernside, Titania and Peter Maersk, provided by Republic; and that the Fernland, the vessel provided to take the first lot, was loaded with 5,000 tons prior to February 15.

12. On January 24 Republic had not yet engaged ships to receive the superphosphate, and on that date Republic's traffic manager, Jessup, so informed Vreeland who had called concerning shipping arrangements.

13. On February 1, Vreeland wrote to Darvin, president of Republic, that although their contract tentatively scheduled the loading of a vessel between February 1st and 15th, Mathieson had as yet received no advice that a vessel would be provided by Republic during that period; that Mathieson was nevertheless holding space for a Republic vessel for the period from February 13 through February 16; that unless "we hear from

you immediately that a vessel will be provided for such loading it will be necessary for us to schedule in other boats for those dates and we may not be able to furnish you with berthing space later in the month." Vreeland asked for "a firm date for shipment" by return mail. Republic received Vreeland's letter on Thursday, February 2.

14. During January Republic had been unable to engage the required tonnage at a price which Darvin was willing to pay. As a result of negotiations over the telephone on February 2 and 3, the respective agents for the Knut Bakke and Igadi orally agreed to take 4,000 long tons on each vessel on specified lay days at Darvin's price of $6.25 per long ton and other terms. Transactions of this kind are customarily carried on as this was and such oral agreements are known in the trade as "fixtures."

15. Republic at the same time engaged tonnage on the Fernland and the Peter Maersk.

16. The negotiations respecting the Knut Bakke and the Igadi were conducted through William J. Martin of Walter De Lappe Company, New York brokers. Darvin personally "conducted most of the negotiations" on behalf of Republic.

17. On February 3, Martin, in accordance with custom, delivered to Republic for Darvin's attention the following "confirmation" letter.

"We are pleased to confirm fixing the following vessels for your account on the following terms and conditions:

Loading port—Baltimore, Maryland (Mathieson Chemical. Corp. dock)

Discharging Port—one safe port Korea

Laydays—'Knut Bakke'   February 8/10, 1950
            'Igadi'        February 13/16, 1950

Cargo—About 4,000 gross tons (for each vessel) of 2240 lbs. each, Fertilizer Material (Superphosphate) in bulk.

Rate—$6.25 U. S. Currency per ton of 2240 lbs. each. Freight to be prepaid in New York on bill of lading quantity on telegraphic advice of signing bill of lading, discountless, non-returnable, ship and/or cargo lost or not lost.

Special Provisions—Cargo to be loaded, stowed and discharged free of risk and expense to the vessel.

      Charterer to nominate discharging port upon completion of loading.

      Otherwise usual berth terms to apply.

"May we take this opportunity to thank you for this business."

Republic admits receiving the letter on February 3. The terms set forth do not include provisions similar to those in the Mathieson-Republic contract to "load an average minimum of 1,000 tons * * * per weather working day, Sundays and holidays excepted"; and to pay demurrage "if this loading schedule is not met."

18. It is the custom of brokers to secure the parties' endorsements on additional memoranda of such fixtures. For this purpose De Lappe used small (8 x 5) printed forms designated "Freight Contracts" with spaces for inserting the terms of the fixture. On February 3, a "Freight Contract" covering each vessel containing, without changes or additions, the terms set out in the confirmation letter, was sent to its agent for endorsement and return. The agents endorsed and returned these to Martin who received them on the 7th. He then sent them to Republic which concededly received them.

19. At the trial Darvin did not deny agreeing on February 3 to the terms stated in the letter and Freight Con-

tracts. He testified, however, that during the negotiations it was understood that the form the contract would ultimately take between himself and the shipowners, "was to be the long form of regular charter details specifying every possible contingency of delays on this end and the discharge on the other end, and fees that are fixed for discharging the ship sooner than contracted for, or demurrage charges for loading it over a longer period, and a lot of other details which are included in a long-form charter contract." He further testified that after he received the Freight Contracts he called Martin and told him "that these Freight Contracts * * * and this letter did not embody all of the terms of a Charter." I do not credit this testimony. It is not supported by that of Martin, Jessup or the vessels' agents. It is inconsistent with the usual custom of general ships in liner service, with Darvin's arrangements with the other vessels engaged to pick up part of the superphosphate, and with his later conduct with respect to the Knut Bakke and the Igadi. It is not contended and in any event there is no evidence that he repudiated the terms stated in the confirmation letter or that he returned it for correction or the insertion of additional terms. Furthermore, while the "Freight Contracts" were not endorsed by Darvin or Jessup, the terms stated in them were not repudiated and the documents were not returned to Martin. I find Darvin agreed to the terms stated in the confirmation letter and in the "Freight Contracts"; that these documents contain all the terms agreed to by him and the vessels' agents; and that the parties did not contemplate the execution of "a long form charter contract" for each vessel.

20. Prior to entering into the foregoing agreements, Republic had not consulted Mathieson as to the availability of its dock on the specified lay days. And Mathieson had not agreed to load the vessels on those dates.

21. It was not until some time on Friday, February 3, after the foregoing oral agreements had been made, that Jessup, with Darvin's knowledge and concurrence, informed Mathieson through two of its officials, Vreeland in New York and McQuade in Baltimore, that Republic had arranged to have certain foreign flag vessels call at Mathieson's plant on the specified dates. As will appear, the loading schedule he proposed would have required the exclusive occupation of Mathieson's dock by Republic's vessels on every working day for two successive weeks commencing on February 6, which was the Monday following the conversations. Late in the afternoon of the 3d, after the conversations, Jessup mailed the following letter to Mathieson for the attention of McQuade who received it on the 6th.

"As per telephone conversation of today, regarding our purchase of 20,000 Tons Superphosphate, we list below the following steamers scheduled to call at your plant.

| | | |
|---|---|---|
| S/S Knut Bakke | – | Feb. 8/10, 1950 |
| S/S Fernland | – | Feb. 6/8, 1950 |
| S/S Igadi | – | Feb. 13/16, 1950 |
| S/S Peter Maersk | – | March 8, 9, 10, 1950 |

"It is also our understanding that regarding the Government Analysis, you have taken this matter up with Mr. Frank Tippet, and should this be incorrect, please contact us immediately."

22. Although Jessup on February 3, by telephone and by mail, requested Government approval of the proposed vessels, it was not until late on Monday, February 6, that oral approval was communicated to Mathieson by telephone. Written confirmation was not received by Republic until Wednesday, February 8.

23. McQuade served as liaison officer between Mathieson's sales offices in Baltimore and New York. He did not, on February 3 or later, either agree to or reject the loading dates proposed by Jessup. He did, however, on February 3, communicate Jessup's message to Cohen, the assistant traffic manager in charge of marine transportation at Baltimore, who supervised the berthing of vessels at Mathieson's dock. Also, on Monday, February 6, McQuade turned over to Cohen Jessup's letter of Friday, February 3.

24. Cohen did not communicate with Jessup or any other official of Republic respecting Jessup's proposals of February 3. It was not the practice for Cohen to discuss such matters directly with Mathieson's customers. His practice was to discuss them with Mathieson's "sales people who in turn tell their customer" if proposals conflict with existing dock schedules or are otherwise unsatisfactory. In this instance he took the matter up with Vreeland who told Jessup that the February dates which he proposed conflicted with commitments Mathieson had previously made for other vessels.

25. Superphosphate cannot be loaded during rain. There had been considerable rain during January, as a result of which, on February 3, Mathieson's loadings were substantially behind schedule. On that date one vessel not yet fully loaded was in the dock and others were scheduled to follow during the period proposed by Republic for its first two vessels.

26. On February 3, Vreeland spoke to Jessup twice. In the first conversation, when Jessup told him the proposed schedule, Vreeland said he would have to check with Baltimore before he could agree to it. In the second conversation later that day he told Jessup that a Government vessel was already scheduled to arrive on February 8; that another vessel, the May, was scheduled to unload sulphur on February 10; that, in accordance with his letter of February 1, Mathieson was still holding the dates February 13 through 16 to load a vessel for Republic. Vreeland did not then agree to load any of Republic's vessels on the dates proposed by Jessup.

27. On February 6, Mathieson was notified that a second Government vessel, the North Beacon, would arrive on February 14 to load superphosphate.

28. The Fernland was at Baltimore on the 6th and, as far as appears, ready to load. The Knut Bakke arrived at 10:45 a. m. on the 7th. On the 8th she was ready to load and Mathieson was so informed.

29. Some time on the 7th Vreeland learned that the Government vessel expected on the 8th would not be in on that day. He thereupon promptly informed Jessup by telephone that as soon as the vessel then loading left the dock, Mathieson would take in Republic's first vessel, the Fernland. In this conversation Vreeland also agreed to and confirmed the dates March 8–10 proposed by Republic for loading the Peter Maersk. He did not, however, agree to the dates proposed for loading either the Knut Bakke or the Igadi. On the contrary, he suggested that Republic arrange to supply one vessel to take 10,000 tons on February 27.

30. Vreeland testified he also told Jessup that, because they required tweendeck stowage, the Knut Bakke and Igadi were "unsuitable vessels." According to Jessup, Vreeland said only the dates were unsuitable. If Vreeland did say what he claims, he was mistaken. Cohen said the vessels were suitable and the Fernland, which required tweendeck stowage, was loaded by Mathieson. I find the Knut Bakke and the Igadi were suitable vessels.

31. Cohen, on February, 7, told the Knut Bakke's Baltimore agents that, in view of the existing dock schedules, he saw no possibility of loading their vessel during her lay days.

32. On February 8, at a conference among Vreeland, McQuade and Worthy, a vice president of Mathieson, it was decided to take in the Knut Bakke on February 13, "if a berth was then available." However, no decision was then made to take in the Igadi on any date.

33. The decision concerning the Knut Bakke was passed on to Cohen who notified the vessel's agents at Baltimore, and to Jessup who notified Martin, the broker. The latter, by telephone and confirming letter dated February 8, informed the Knut Bakke's agents in New York that Republic "this day advised us that they anticipate berthing the * * * vessel * * * on or about February 13, 1950." The agents did not consent, either orally or in writing, to this proposed change in the vessel's lay days.

34. There was no testimony that the foregoing commitment as to the Knut Bakke or Vreeland's to Jessup on February 3, to take in "a Republic vessel" between February 13 and 16, was expressly conditioned on the existence of suitable weather on the named dates. However, it was well known that superphosphate cannot be loaded in rain, and the contract between Mathieson and Republic was "to load * * * per weather working day." Accordingly, Republic's officials must have understood all commitments as to loading dates to be so conditioned. I find they were and were so understood.

35. The Fernland came in on the morning of the 9th and her loading commenced. It had to be suspended because of rain for more than four hours on the 9th and for eight hours on Friday, the 10th. Her original allotment of 4,000 tons was, at Republic's request, increased to 5,000 tons. She did not leave the dock until early in the morning of Monday, the 13th. It was raining at that time and rain was forecast for the rest of the day and for the succeeding two days.

36. The May had been standing by since the 10th, the date on which, as early as the 3d, she had been scheduled to discharge a cargo of sulphur, a commodity which can be worked without damage during rain. In view of this and the forecast, common sense dictated that the risk of further delay at the dock be avoided by bringing the May in at once, rather than the Knut Bakke whose cargo could not be loaded in rain. Accordingly, as soon as the Fernland left the dock the May was brought in. It rained continuously during the 13th, 14th and 15th while her cargo was being discharged. Three working days were thereby saved which would have been lost, with no corresponding advantage, if the Knut Bakke had been at the dock.

37. As will appear in a later finding (42), it was Cohen's intention to bring in the Knut Bakke on the 16th. However, there was no testimony that on the 13th he so informed her agents. His notes concerning Republic's vessels appear to have been fairly complete and it is unlikely he would have failed to record it if he had so informed the agents; or that he would have failed so to testify if this was reflected in his notes. I find he did not so inform the agents.

38. From February 7, when the Knut Bakke reached Baltimore, Siefert, the manager of her New York agents, was in almost daily communication with Martin and, when he could, with Jessup, pressing to get the vessel berthed. Siefert could not recall whether he told either Jessup or Martin that the vessel would pull out if her loading was not commenced by the 10th, her last lay day. I find, however, from Darvin's testimony that he learned at least by the late afternoon of Friday, the 10th, that the agents were not going to hold the vessel at Baltimore unless they were given a "definite promise" as to when she would be loaded.

39. The vessel's agents did not notify Mathieson of their intention, nor did Darvin or Jessup.

40. Monday, February 13, was observed as a legal holiday at Republic. Some time during the weekend Darvin

called Jessup at home and directed him to go to Baltimore "the next working day," which, at Republic, was the 14th, and to "make every endeavor to get the Knut Bakke to come back, and in the event that he could not do that, try to pull in the Igadi and have that loaded." Jessup arrived at Cohen's office some time before noon on the 14th.

41. The testimony of Jessup and Cohen conflicted in important respects as to what transpired at Cohen's office. Jessup was not produced at the trial. His testimony was introduced through his deposition taken several years after the event. At that examination, he stated he was relying entirely on his recollection unaided by any contemporaneous notes or memoranda. Cohen testified at the trial from notes which he made and had transcribed shortly after the events therein recorded. These included his conversations with Jessup on the 14th. Cohen impressed me as a frank and truthful witness. I consider his testimony as to what occurred as more likely than Jessup's to be accurate, and find as follows.

42. Rain was not forecast beyond the 15th and, barring accident, the May, on the basis of past experience, was expected to finish discharging that day, as in fact she did. Cohen, after pointing out that because of the rain it was impossible to load the Knut Bakke even if she had been brought in on the 13th, told him he planned to take her in on the 16th. He refused Jessup's request for "a letter of guarantee to that effect," but assured him "if everything goes according to our expectations we will load her the morning of the 16th." In Jessup's presence, he called the Knut Bakke's local agents, to confirm this to them and then learned for the first time that she had already left Baltimore. Her log shows she remained at Baltimore throughout the 13th and sailed at 6:15 a. m. on the 14th for New York. Jessup did not then ask that the Igadi be taken in; rather he said he would "go over and see the agents" of the Knut Bakke, presumably to try, as Darvin had di-

rected, to get that vessel to return. Cohen asked him to call back by 3 p. m. to "let me know if she is returning before I make any other plans for the 16th." When Jessup had not called by 4 p. m., Cohen called the Knut Bakke's agents and was told she would not return. He thereupon arranged with the North Beacon's agents to take her in on the 16th. She had arrived in Baltimore on the 12th and on the 14th served her notice of readiness to load as scheduled. At about 4:45, Cohen received a call from Jessup who said he was "going to put the Igadi in on the 16th." Cohen said he could not then agree to this because he had already made other arrangements; but if Jessup would come in the following morning, the 15th, he would "try and see if something can't be worked out." Jessup did not come back on the 15th and did not again communicate with Cohen about the Igadi.

43. At the trial, the vessels' agents conceded that since the cargo here involved cannot be loaded in rain, under the "usual berth terms" provision "the ship would suffer [any] delay" in loading which was caused by rain; and that Republic would not be in default for even a total failure to load during the lay days if this was caused by rain.

44. Republic's failure to load the Knut Bakke on the first of her lay days, the 8th, although she was then ready, was not due to rain. No rain fell on that day. The failure was due to the fact that Republic could not furnish her a berth on that day. This in turn resulted from Republic's failure to arrange "shipping details [with Mathieson] on a mutually satisfactory basis" before committing itself to furnish cargo to the vessel on specific days. Vreeland's letter of the 1st gave Darvin no warrant for supposing that the dates February 6 through 10, on which he agreed to furnish cargo to the Fernland and Knut Bakke, would be satisfactory to Mathieson. Indeed the letter clearly indicated the contrary. The Knut Bakke was ready to load on the 9th also. And, despite the four hours of rain, she could have loaded during

part of that day except for the fact that the Fernland was then in the dock. This, as already found, was with Republic's knowledge and, it is a fair inference, with its consent as well. There was not, it is true, any testimony that Jessup expressly agreed to Vreeland's proposal on the 7th to take in the Fernland as soon as the vessel then loading, cleared the dock. However, it is not claimed and there is no testimony that he objected, or urged that the Knut Bakke be taken instead. As already found, both were acceptable vessels and both are concededly of the same type. Surely then, it was a matter of indifference to Mathieson whether one or the other came in first. Mathieson, however, was obligated to load only one thousand tons per weather working day and even if rain did not interfere it was entitled to four working days to load each vessel's allotment of 4,000 tons. It could, of course, load faster, but Republic had no right to demand that it do so. It was obvious, therefore, that as a practical matter Republic could carry out its commitment to but one of the vessels and had to choose which it would be. I find that Republic chose to have the Fernland, whose lay days expired on the 8th, loaded during the days Republic had previously agreed to load the Knut Bakke; and also consented to have the Knut Bakke's loading put off until February 13–16, in the hope her agents would agree to change her lay days.

45. Cohen's notes recorded his "understanding" that on or before Thursday, the 9th, the Igadi had been "eliminated by mutual consent" from Republic's proposed loading schedule. I find it was. There was indeed no testimony that either Darvin or Jessup expressly withdrew the Igadi's nomination. However, when Republic agreed on February 8 to have the Knut Bakke loaded during February 13–16, the effect was to cancel so much of its February 3 proposals to Mathieson as specified those dates for loading the Igadi. That Republic recognized this is clear from Jessup's letter of February 10 to Martin as follows:

"As per telephone converstion of today regarding the [Igadi] which was scheduled to lift four thousand (4000) long tons Super Phosphate from the Mathieson Chemical Company and because of conditions beyond our control, we are hereby giving notice that the dates for pick-up must be altered.

"Will you kindly contact the owners of the steamer, requesting that they extend the pick-up dates to about, February 27th to March 1st, or if they care to take this commodity on some other steamer of theirs about this time or later in March, please let us know the dates and steamer name and we will make the necessary arrangements."

46. The Igadi's agents never consented to either of the foregoing proposals. On the 10th, the day they were made, the vessel was only one day out of Baltimore, having sailed on the 7th from Houston, Texas. On the 11th, her agents informed the brokers that, although Mathieson had advised the vessel it had no commitment to load her, she would nevertheless report ready to load on the 13th pursuant to her contract with Republic. The brokers forthwith transmitted this information to Darvin by telephone and a confirming letter delivered by hand and received on the 11th.

47. The Igadi anchored at Baltimore on Sunday morning, February 12. On the 13th she served her notice of readiness to load. This was rejected by Mathieson. On the same day her agents wired and wrote Republic tendering the vessel; and advising that Mathieson had rejected her notice of readiness claiming it had no commitment with Republic to load her; and that the agents would hold Republic liable for all consequences. She remained at her anchorage until 11 a. m. on the 16th. She then moved to a pier close to Mathieson's where she was to take on 90 tons of other cargo previously contracted for. This, however, she did not commence to load until 8 a. m. on the 17th. At all times during her lay days she was avail-

able and, weather permitting as it did on her last lay day, the 16th, she was ready to load Republic's cargo. She was never called in to do so. She completed loading the 90 tons at 2 p. m. on the 17th and at 3:25 p. m. she sailed. She did not notify Mathieson that she was sailing.

48. It indeed rained throughout the 13th, 14th and 15th. But even if it had not, the Igadi could not have been loaded on those days because the Knut Bakke which was still available would have been brought in on the 13th, pursuant to Republic's agreement of the 8th. No rain fell on the 16th, but she was not loaded that day. The failure to load her during her agreed lay days resulted from the arrangements Republic made with Mathieson on the 8th to have the Knut Bakke loaded during those days; and from Republic's failure, on the 14th, when it learned that vessel had left, to make timely request of Cohen to load the Igadi in place of her on the 16th.

49. On the 15th and again on the 17th, Jessup, orally and in writing, offered proposals for loading the Fernside and the Titania, during the first week in March. On February 20 these proposals were agreed to by Mathieson in writing and, as already found, the vessels were loaded.

50. Mathieson made every reasonable effort to arrange "shipping details * * * on a mutually satisfactory basis." One week after the contract with Republic was closed, Vreeland called Jessup to discuss shipments and the following week he wrote Darvin. The proposals with respect to the Peter Maersk, the Fernside and the Titania, all of which afforded Mathieson reasonable time to correlate them with its commitments to other customers, resulted in mutually satisfactory arrangements.

51. McQuade's lack of comment on the 3d concerning the dates proposed by Jessup did not constitute consent to them. And in view of Vreeland's two conversations with Jessup that day, Republic had no rational basis for assuming, as it now claims it did, that the dates were satisfactory to Mathieson. Republic was not misled.

52. Mathieson, in view of its existing commitments and the actual situation at its dock on Friday, February 3, was not unreasonable in refusing to agree on that day to commence loading Republic's vessels the following Monday, and to continue loading on every working day thereafter for the two following weeks. Despite the shortness of notice, as soon as the change in existing commitments, which occurred on February 7, made it possible to take in the Fernland as soon as the dock cleared, and the Knut Bakke later, Mathieson agreed to do so; and did take in the Fernland.

53. Mathieson's failure to take in the Knut Bakke while it was raining on the 13th was not unreasonable and was not a breach of its commitment to take her in on that day "if a berth was then available."

54. Mathieson never having agreed to load the Igadi during February 13–16, it was not unreasonable, in light of Republic's agreement on the 8th and what had transpired earlier on the 14th, for Cohen to reject Jessup's last minute proposal to bring in the Igadi on the 16th.

█ The unavailability of Mathieson's pier did not change Republic's positive engagements to load the Knut Bakke and Igadi on specified days. Those engagements were made without first consulting Mathieson and in light of the implications of Vreeland's letter of February 1.[1] Accordingly, Republic is liable unless, as it contends, the respective lay days were extended for periods equivalent to the lay days on which cargo could not be loaded because of rain. They were not so extended. Republic's agreement with Mathieson on the 8th to have the Fernland loaded during the Knut Bakke's lay days and Republic's

1. Carbon Slate Co. v. Ennis, 3 Cir., 114 F. 260; New Ruperra S.S. Co. v. 2,000 Tons of Coal, D.C., 124 F. 937, affirmed sub. nom. W. K. Niver Coal Co. v. Cheronea S.S. Co., 1 Cir., 142 F. 402, 5 L.R.A.,N.S., 126, certiorari denied 201 U.S. 647, 26 S.Ct. 761, 50 L.Ed. 904. See Peck v. United States, C.C., 152 F. 524.

notice of the same day to the latter's agents that she would not be loaded during those days were "acts evincing an intention to refuse performance in the future."[2] This, since it was never withdrawn, terminated the contract,[3] and relieved the vessel of any obligation to remain.[4] The same is true as to the Igadi. Republic on February 8 agreed to have the Knut Bakke loaded during February 13–16, and on February 10 notified the Igadi's agents that she could not be loaded during those days as had been agreed. Under the circumstances it is irrelevant that the Knut Bakke and the Igadi did not notify Mathieson of their departures.

### Conclusions.

1. The libelants are entitled to maintain the suit.

2. The court has jurisdiction of the parties and subject matter.

3. The respondent breached its contracts with both vessels and relieved each of them from any obligation it had under the contracts.

4. The libelants performed all their obligations under the contracts except as to those which they were prevented and relieved from performing by the respondent's breach.

5. The libelants are entitled to an interlocutory decree in their favor with costs on the issue of liability. The issue of damages, unless agreed to by the parties, will be referred to a Commissioner.

6. Mathieson performed all of its obligations under its contract with Republic.

7. Mathieson is not liable to Republic.

8. Mathieson is entitled to have the Republic's impleading petition dismissed with costs.

A decree in accordance herewith may be submitted on five days' notice.

2. New York Life Ins. Co. v. Viglas, 297 U.S. 672, 681, 56 S.Ct. 615, 80 L.Ed. 971.

3. Spanish American Line v. Baugh Chemical Co., D.C., 47 F.2d 261; Bonanno v. Tweedie Trading Co., 1952 A.M.C. 643.

4. See Roehm v. Horst, 178 U.S. 1, 20, 20 S.Ct. 780, 44 L.Ed. 953.