COMMODITY CREDIT CORPORA-
TION, Appellant,

v.

ROSENBERG BROS. & CO., Inc., a
Corporation, Appellee.

ROSENBERG BROS. & CO., Inc., a
Corporation, Appellant,

v.

COMMODITY CREDIT CORPORA-
TION, Appellee.

No. 14884.

United States Court of Appeals
Ninth Circuit.

March 7, 1957.

Rehearing Denied May 13, 1957.

Lloyd H. Burke, U. S. Atty., San Francisco, Cal., George Cochran Doub and Warren E. Burger, Asst. Attys. Gen., Carl Eardley and Melvin Richter, Attys., Washington, D. C., for appellant.

Lloyd Dinkelspiel, Edward W. Rosston, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., Melville Ehrlich, Washington, D. C., for appellee.

Before DENMAN, Chief Judge, and McALLISTER and BARNES, Circuit Judges.

McALLISTER, Circuit Judge.

Rosenberg Bros. & Co., Inc., hereinafter called "Rosenberg," sued the Commodity Credit Corporation, hereinafter called "Commodity" or "the government," for breach of contract, and, on a trial before the district court, sitting without a jury, secured a judgment in its favor in the amount of $160,366.88. Both parties appeal, Rosenberg claiming that it is entitled to more; the Commodity Credit Corporation claiming that it is entitled to nothing.

The background of the case is as follows: On September 10, 1947, pursuant to a government program to support and stabilize the prices of dried fruits, the Secretary of the Department of Agriculture, who was also the Chairman of the Commodity Credit Corporation, asked for offers for the sale of 30,000 tons of raisins and various quantities of other dried fruits. Rosenberg, on September 19, offered to sell 10,000 tons of raisins to Commodity at prices ranging between $151 and $152 per ton, according to the kind of containers used. Rosenberg's offer was accepted by Commodity on September 23. On September 24, a standard government contract was executed between Rosenberg and Commodity, by the terms of which Rosenberg agreed to deliver 10,000 tons of raisins to Commodity in the period October 1–December 15, 1947, upon demand and at the prices set forth in the contract. These raisins were never delivered in accordance with the contract. Rosenberg, at the time it executed the contract, did not have the raisins on hand or available. It was selling them in the expectation that raisins would drop in price sufficiently to enable it to fulfill the contract without loss. On October 1, 1947, the Department of Agriculture asked for further bids for the sale of dried fruits, including 31,000 tons of raisins. A week later, on October 8, Rosenberg offered to sell Commodity 10,000 tons of raisins, and on October 13, Commodity accepted Rosenberg's offer to the extent of 4,330 tons, priced at $149.40 per ton, and on the same day, a contract was executed for that quantity of raisins at the stated price.

On October 14, the Department of Agriculture announced further purchases, and asked for bids for an additional 60,000 tons of raisins. Rosenberg then requested cancellation of its contracts, but this request was denied.

On November 26, 1947, the purchasing program of raisins was modified by requiring all packers who *thereafter* sold Thompson seedless raisins (the kind here

in question) to certify that they had paid the grower not less than $135.00 per ton.

At the time of the execution of the contracts, Rosenberg, as has been mentioned, had not purchased and did not have available raisins to fill the government contracts. It was selling short in the hope that raisins would drop in price sufficiently to enable it to fulfill the government contracts without loss. However, the growers refused to sell at the lower prices offered, and Rosenberg purchased only 800 tons during the period from September 1, 1947, to November 3, 1947, during which time it had agreed, in the written contract, to sell to the government a total of 14,330 tons of raisins.

After November 3, 1947, raisins were sold by growers in substantial quantities at prices ranging from $127.00 to $142.00 per ton. Since Rosenberg's normal processing and packing charges averaged $40.00 per ton, it was impossible for Rosenberg to purchase raisins from growers for sale to the government at $149.40 or $152.00 per ton, in compliance with its contracts, without suffering substantial loss.

The government continually demanded delivery of the raisins from Rosenberg; and Rosenberg continually refused to deliver, stating that it had no raisins available.

In January, 1948, the price of raisins dropped, and during that month, they were being sold by growers at prices ranging from $100.00 to $125.00 per ton. At that time, Rosenberg decided to make delivery to the government, since, at that price, it would be enabled to purchase raisins at the lower prices, and fulfill its government contracts.

On January 22, 1948, Rosenberg requested shipping instructions and asked for an amendment to the contract, relating, however, only to reinstating the tonnage and extending the delivery dates. The government agreed to an amendment reinstating the tonnage and extending the delivery dates, and further agreed not to hold Rosenberg for damages for nondelivery, or delay in delivery, in return for Rosenberg's waiving all carrying charges. Delivery of the orders was then made by Rosenberg during February and March, 1948. Vouchers for the raisins delivered were submitted by Rosenberg and paid by the government. Thereafter, Rosenberg filed a claim against the government for damages for breach of an implied contract, on the theory that the government, through changes in its program of purchasing raisins, had obstructed Rosenberg in the performance of its contract, and, at the same time, had increased the cost of such performance. Upon the government's rejection of its claim, Rosenberg brought the present action, and the district court, sitting without a jury, entered a judgment in favor of Rosenberg in the amount of $160,366.88, from which the government appeals.

It is the chief contention of the government that there was no implied contract with Rosenberg, and, consequently, no breach of such a contract.

Rosenberg claims that a "press release" issued by the Secretary of Agriculture at Albuquerque, New Mexico, on September 5, 1947,[1] forms the basis of

---

1. The press release is as follows:

"Secretary of Agriculture Clinton P. Anderson announced that Commodity Credit Corporation will purchase up to 133,000 tons of dried apples, dried peaches, dried prunes and raisins if the purchase of this total quantity of dried fruits is necessary to provide outlets for the relatively large 1947 production. The purchases will assist the industry in disposing of this expected surplus of supply and provide an excellent food for foreign relief feeding and school lunches.

"The maximum limit of 133,000 tons is divided into purchase of 2,250 tons of dried apples, 3,750 tons of dried peaches, 61,000 tons of raisins, and 66,000 tons of dried prunes.

"Purchases of the dried fruits under the program will be made from processors and packers of dried fruits. An announcement will be issued soon inviting packers to submit offers on a portion of the quantity to be purchased.

"Most of the prunes procured by the Commodity Credit Corporation will be of the 70/80, 80/90, and 90/100 sizes.

the implied contract; and that, in effect, it became part of the contract when Rosenberg made an offer of sale of the raisins to the government based upon the terms of the press release, and upon which, the government accepted such offer. Rosenberg contends that the government breached its contract by purchases of raisins contrary to the terms of the press release and by subsequently imposing further conditions upon sales by Rosenberg which greatly increased the cost of Rosenberg's performance of its contract.

The government submits that the press release in question was not intended to create private contractual rights, and that it created none; that it contained no representations of a contractual nature; and that it was merely a declaration of policy.

When, on September 10, 1947, the government invited orders for the sale of 30,000 tons of raisins to be delivered during the period October 1, 1947 to December 15, 1947, there was no mention of its announcement of the press release of September 5, 1947. Furthermore, when, on September 19, 1947, Rosenberg submitted an offer to sell 10,000 tons of raisins to the government at prices ranging between $151.00 and $152.00 per ton, no reference was made, in such offer, to the press release. Finally, on September 23, 1947, when the government accepted Rosenberg's offer, and when, on the following day, a standard government contract was executed in which Rosenberg agreed to deliver 10,000 tons of raisins to the government during the period, October 1–December 15, 1947, upon demand and at the prices stated therein, no reference was made to the press release, either in the government's acceptance of Rosenberg's bid or in the terms of the formal written contract; and the same is likewise true of Rosenberg's sale to the government of 4,330 tons of raisins on October 13, 1947.

If this case is to be determined on the basis of written contractual stipulations between the parties—the invitation to bid, the bid, and the acceptance—the government is not liable to Rosenberg in any amount. It is only on the theory of some kind of implied contract that Rosenberg seeks to prevail.

■■■ Where the parties have deliberately put their engagement into writing, the writing is presumed to contain the entire contract, and all the prior and contemporaneous agreements are merged therein, and cannot be shown by parol evidence. The contract may be read in the light of surrounding circumstances in order more perfectly *to understand the meaning and intent of the parties;* but where a contract is unambiguous, there is no need to ascertain the meaning and intention of the parties outside of the terms of the agreement. United States v. Fidelity & Deposit Co. of Maryland, 2 Cir., 152 F. 596. The rule that the surrounding circumstances should be considered does not apply where the language of a written agreement is plain, and not susceptible of more than one meaning.

■■■ Rosenberg, however, relies upon the rule that each party to a contract impliedly agreed not to prevent the other party from performing, or to render performance impossible by any act of his own. It contends that the government agreed not to purchase more than 61,000 tons of raisins during its entire program, and, moreover, that the purchases would be made from processors and packers; and this contention is based solely on what was set forth in the press release above mentioned,[2] none of which was

Raisin purchases will be confined to the Thompson Seedless variety.

"The purchase program does not provide price support at any given level, but is expected to result in reasonable prices to producers and consumers.

"Department officials stated that the program should enable the dried fruit industry to complete its plans for readjustment on a self-help basis. It was emphasized that Government purchases should not be regarded as the permanent solution of the dried fruit surplus problems."

2. See Footnote 1 ante.

mentioned or referred to in the written contract executed between the government and Rosenberg. By virtue of the press release alone, Rosenberg founds its case on breach of implied contract. We do not consider that the government can be held to have agreed with Rosenberg, implicitly or expressly, by virtue of the press release, not to purchase more than 61,000 tons of raisins; and that a subsequent purchase by the government of more than this amount gave Rosenberg a right to damages.

The government agency here involved, the Commodity Credit Corporation, was created by Congress for the purposes, among others, of stabilizing and protecting farm income and prices; of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, and of facilitating the orderly distribution of agricultural commodities. Title 15 U.S.C.A. § 714. It was granted the specific powers, by Congress, to support the prices of agricultural commodities through loans, purchases, payments, and other operations; to increase the domestic consumption of agricultural commodities by expanding or aiding in the expansion of domestic markets, or by developing new and additional markets and uses for such commodities; to export, or cause to be exported, or aid in the development of foreign markets for, agricultural commodities. Title 15 U.S.C.A. § 714c. Having in mind these objectives and powers confided to it by Congress to carry out a vast national program in support of our agriculture, it is impossible to find, in a reading of the "press release" by the government to the public and to agricultural interests as to what the "program" would be, a binding contract with any individual who might thereafter enter into a separate and detailed written contract with the government, that the Commodity Credit Corporation would not subsequently modify any part of the program announced, except at the peril of paying damages of hundreds of thousands, or millions of dollars to anyone who dealt with the Commodity Credit Corporation as a sell-er, even though such a modification of program might not only be intelligent and beneficent, but absolutely necessary if the agency were to carry out the duties confided to it and imposed upon it by Congress. A reading of the "press release," in the light of the purposes and powers of the Commodity Credit Corporation, as set forth in the statute, does not disclose that the press release must be construed as a binding promise to Rosenberg that the program mentioned therein would not in the future be changed without peril to the government. But it is not necessary to place our determination on the ground that the government did not impliedly agree not to vary its program, as announced in the press release.

Rosenberg had offered to sell 10,000 tons of raisins to the government on September 19, 1947. It had no raisins on hand; and before it delivered any, the government, on October 1, asked for further bids on 31,000 more tons of raisins. When the government asked for bids on 31,000 more tons, Rosenberg offered, on October 8, 1947, to sell the government another 10,000 tons of raisins in addition to the 10,000 tons it had already sold to it. On October 13, the government accepted Rosenberg's offer to the extent of 4,330 additional tons, which brought the aggregate that Rosenberg had sold to the government, up to that time, to 14,330 tons. None had been delivered.

On October 14, 1947, the government announced that it would purchase 60,000 more tons of raisins, in addition to the 61,000 tons theretofore purchased. Rosenberg then asked that the government cancel its contracts to sell the prior aggregate amount of 14,433 tons. The government refused to cancel. Where did Rosenberg stand then? It had purchased no raisins. It had delivered none. It wanted the government to let it out of the contracts. The government refused. Who was damaged? How much?

If Rosenberg was damaged by reason of the government's announced purchases on October 14, 1947, of 60,000 tons of

raisins in addition to the first purchases of 61,000 tons, when was it damaged? If Rosenberg had refused to do anything further, when the government had refused to cancel its contract, on October 14, 1947, what damages would Rosenberg have suffered? Not a penny. It had not delivered any raisins. It had not bought any. It had no claim for damages, and it made no such claim. It only wanted to get out of the contracts. These were the only contracts of sale of the raisins between Rosenberg and the government. How, then, does Rosenberg build up its claim of damages against the government on these contracts to the sum of $329,437.53, which it now claims?

Rosenberg contends that the government caused the prices of raisins to rise in the market by buying more than the original amount of 61,000 tons, which it had announced it would purchase in its press release of September 5, 1947. It further claims that, when the government, on November 26, 1947, required all packers who thereafter sold raisins, to certify that they had paid the growers not less than $135.00 per ton, it caused an abnormally high rise in the field prices of raisins and resulted in damage to Rosenberg by reason of its being required to purchase the raisins at such higher prices in fulfillment of the government contracts.

In sum, according to Rosenberg's claim, the government had breached its contract by purchasing raisins in the open market, when it had agreed not to do so—and, further, by subsequently requiring packers, after November 26, 1947, to certify that they had paid growers not less than $135.00 a ton.

We may assume, for the argument, that Rosenberg is right in its contention as to the breach. Then the government was not entitled to delivery of the raisins from Rosenberg after the first breach of contract on October 14, 1947, nor after the second alleged breach on November 26, 1947, and Rosenberg would, accordingly, be discharged from any obligation under the contracts by reason of the government's breach. As has been re-marked, at the time of the alleged breaches by the government, Rosenberg had suffered no damages, since it had bought no raisins, and had delivered none. It commenced to purchase raisins to fulfill the government contract only in the latter part of December, 1947. Yet, in spite of these facts, we find Rosenberg, more than three months after the breach by the government of the so-called implied contract, upon which it mainly relies in this case, asking the government to amend the contract by extending the time for delivery of the raisins. No raisins had been delivered up to the latter part of December, 1947, and, certainly, no claim of damages could have been made up to that time. And no claim of damages was made by Rosenberg when it asked the government to amend the contract as late as January 22, 1948.

The circumstances leading up to Rosenberg's request for revision of the written contract are pertinent. On January 21, 1948, the government demanded that Rosenberg deliver the raisins under the terms of the contract. On January 22, 1948, Rosenberg replied to the government, stating that it had been unable to deliver the raisins "Because of our inability to secure the raisins, due to the confused situation in the San Joaquin Valley resulting in an almost total stoppage of movement of raisins into our Fresno plant, and because of our failure to secure any relief from Washington * * *. We are now in a position to make deliveries against this contract, and it is our understanding that before the Shipping and Storage Branch can instruct shipment against this contract, it will be necessary to issue an amendment reinstating this tonnage and extending the delivery date. We will appreciate it if you will furnish such an amendment." No mention was made of any breach up to this time.

On January 26, 1948, the government, in a telegram, emphasized Rosenberg's default in delivery and asked if it would deliver the raisins, provided no damages for nondelivery would be sought by the government, other than the waiver

by Rosenberg of carrying charges. The government also stated: "We are willing to take delivery on all of the quantities covered by both the above mentioned contracts *at the contract prices*. * * * We will not pay carrying charges on any raisins * * *. This telegram is sent without prejudice to any rights of Commodity Credit Corporation. If this arrangement is agreeable to you please indicate your agreement therewith by advising us not later than 500 PM January 28, 1948. Otherwise please indicate your intention as to your performing on these contracts." (Emphasis supplied) Here, the government was saving any rights it had against Rosenberg.

On January 28, Rosenberg responded by telegram, stating: "This Confirms Our Agreement to Extend Period for Shipment as Outlined Your Wire. Will Appreciate Receiving Prompt Shipping Instructions * * *" There was no mention here by Rosenberg of any claimed breach on the part of the government, or any reservation of a claim for damages.

The government thereafter issued shipping instructions and the raisins were delivered in February and March 1948. Rosenberg thereafter proceeded to bill the government for the raisins delivered under the contracts, as amended, upon standard voucher forms, certified that the bills thus presented were correct and just and that "all conditions of purchase applicable to the transactions had been complied with." No reservations of a claim for damages, or breach of contract, were contained in the voucher forms; and Rosenberg accepted payment of the vouchers, based on the original contracts, at the prices originally agreed upon, as was required by the government when it consented to the amendment of the contract extending time for delivery and waiving any claim for damages on account of Rosenberg's nondelivery up to that time.

■■ It is the general rule that one who is injured by the wrongful acts of another, whether as the result of a tort or of a breach of contract, is bound to exercise reasonable care and diligence to avoid loss or to minimize or lessen the resulting damage, and, to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to this failure to exercise such care, he cannot recover. He is bound to protect himself if he can do so with reasonable exertion or at a trifling expense, and can recover from the delinquent party only such damages as he could not, with reasonable effort, have avoided. He must do nothing to aggravate his loss, but must do all he can to mitigate or reduce it. Campfield v. Sauer, 6 Cir., 189 F. 576.

■ We do not consider that the government ever breached its contract with Rosenberg; but if it did, Rosenberg was not damaged at the time of the alleged breach in October, 1947, or in the following months of November or December, nor does it claim that it was damaged at that time. It would have been damaged in no way by the claimed breach if it had simply refused to deliver under the contract. Where there has been a breach of contract in a contract of sale, and nothing has been yet done by the seller under the contract, the proper course for the seller is to refrain from doing anything, unless such course, in itself, would enhance the damages which the seller would suffer. And where the seller refrains from doing anything after the breach, the measure of his damages will be only the profit he would have derived had the contract been carried out. Williston on Sales, Section 1299. It is held that where a party is entitled to the benefit of a contract and can save himself from a loss arising from a breach of it at a trifling expense or with reasonable exertions, it is his duty to do it; and he can charge the delinquent with such damages only as, with reasonable endeavors and expense, he could not prevent. Warren v. Stoddart, 105 U.S. 224, 229, 26 L.Ed. 1117. A party injured by a breach of contract has no right to perform, if by so doing, damages will be enhanced. It is the duty of the injured party to minimize rather than increase

512

them. A plaintiff cannot hold a defendant liable for damages which need not have been incurred. If a man engages to have work done, and afterward repudiates his contract before the work has been begun, it is inflicting damage on the defendant without benefit to the plaintiff to allow the latter to insist on proceeding with the contract. The plaintiff must so far as he can, without loss to himself, mitigate the damages caused by the defendant's wrongful act. Spanish American Line, Inc. v. Baugh Chemical Co., D.C.Md., 47 F.2d 261. See also Williston on Contracts, Section 1298.

 Even in cases where a party has been fraudulently induced to make either a contract of sale or purchase, it follows that if, after full knowledge of the fraud or deceit, he goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred. The maxim *volenti non fit injuria* has application to all loss resulting from the voluntary execution of a nonobligatory contract with full knowledge of the facts which render it voidable. Fraud without damage is not actionable. If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not, as he chooses. If he executes it, and the loss happens from such voluntary execution, he cannot recover damages which he deliberately elected to incur. The execution of the contract, so far as it was executory after full knowledge of the fraud, is equivalent to an adoption of the contract with full knowledge of the facts. Simon v. Goodyear Metallic Rubber Shoe Co., 6 Cir., 105 F. 573. A party to an executory contract procured by false representations who, after knowledge that the representations are false and fraudulent, performs, or, without necessity, completes performance of the contract, and accepts payment according to its terms, thereby waives the fraud. Baltimore & Ohio Railroad Co. v. Jolly Bros. & Co., 71 Ohio St. 92, 72 N.E. 888.

The Uniform Sales Act provides, in Section 64(4), as follows: "If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligation under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand."

The basis of the rule in the above clause is not the fact that the contract is, in the contemplation of the parties, one for the manufacture of goods, but the general obligation must rest upon a party, whose rights have been invaded, to take such a course as is reasonably likely to minimize the damage which he will suffer; and the rule is not confined to cases where there is an anticipatory breach by way of a repudiation of a contract, but applies also where the breach of contract is based upon the buyer's failure to give orders for further deliveries as contemplated by the contract. Zimmerman Radio Corp. v. Bronson & T. Co., 108 Conn. 632, 144 A. 301.

Moreover, a breach of contract caused by a buyer's insistence on more expensive materials in making articles than was contemplated between the parties, is equivalent to a repudiation of the contract, or notification to the seller not to proceed, in so far as it bears upon the rights of the seller. Capitol Paper Box, Inc., v. Belding Hosiery Mills, Inc., 350 Ill.App. 68, 111 N.E.2d 858. Where damages are claimed, not for the direct injury, that is, the loss of the value of the contract itself, but for consequential loss, as in the instant case, the plaintiff cannot recover for such loss, if he might reasonably have avoided it. Bear Cat Mining Co. v. Grasselli Chemical Co., 8 Cir., 247 F. 286.

It follows, from the foregoing, that where there has been a breach of contract, a party does not have the right to take action which serves only to cause damage to the other party. In the in-

stant case, if there was a breach of contract, it justified nonperformance by Rosenberg; but, if there was such a breach, it was not the breach that created the damages, but, rather, Rosenberg's action in performing the contract; and it cannot pile up damages against the government by such conduct.

Here, Rosenberg, in order to save itself from loss, according to its own claim, was not obliged to make any exertion or indulge in any expense whatever. It had purchased no raisins and delivered none for months after the claimed breach by the government. The contract, at the time of the breach and for months afterward, was wholly executory. In executory contracts covering a period in the future, it is the duty of a party whose contract has been broken to take reasonable steps to minimize his damages. Kessler v. Jefferson Storage Corp., 6 Cir., 125 F.2d 108. Rosenberg claimed that it commenced the delivery of raisins, three months after the alleged breach, at the contract prices, by purchasing them at such high prices that it suffered a loss of $329,437.53. Accepting its contention as to the damages it suffered—which is most questionable, in our view—it follows that Rosenberg deliberately enhanced the loss instead of using reasonable care and diligence to avoid or lessen it; and, accordingly, it cannot recover.

In addition, after the alleged breach, or breaches, had occurred, Rosenberg performed the contract and accepted the prices stipulated therein. In Francis v. United States, 96 U.S. 354, 360, 24 L.Ed. 663, where a dispute arose between a contractor for the delivery of a commodity and government officials as to how the contract was to be carried out, and although the contractor would legally have been able to recover the extra expense caused him by improper interference on the part of such officials, nevertheless, when the contractor delivered the commodity under the contract collected and received the contract price, and gave receipts in full as for a transaction completed pursuant to the contract, it was held that such actions proved an accord and satisfaction and he could not recover for the extra expense. See also Willard, Sutherland & Co. v. United States, 262 U.S. 489, 43 S.Ct. 592, 67 L.Ed. 1086.

There was, in fact, no disputed claim on Rosenberg's part, which was advanced by it or recognized by the government, when Rosenberg performed the contracts. It had previously, in October, 1947, asked the government to let it out of its contracts. But the government refused. In January, 1948, the government called upon Rosenberg to perform, after it had long been in default. When the contract was reinstated, at Rosenberg's request, with an extension of time for delivery, the government, in writing, required delivery at the contract price, and agreed that if such delivery was made, it would waive any claim for damages for nondelivery. It is true that Rosenberg, through its official in charge, proposed that the reinstatement of the contracts contain a provision reserving to Rosenberg the right to assert a claim against the government. But before delivery of the raisins under the contract, the government rejected such proposal. Rosenberg thereafter performed the contract, delivering the raisins during the next two months at the contract prices, and billed the government upon standard voucher forms, certifying that the bills presented were correct and just and that all conditions applicable to the transaction had been complied with. No reservations of any kind were contained in the voucher forms; and Rosenberg accepted payment of such vouchers, at the contract prices. Where a party, following a dispute as to the price due, performs the contract and accepts the stipulated price, it cannot then claim damages for a breach of contract. Early & Daniel Co. v. United States, 271 U.S. 140, 46 S.Ct. 457, 70 L.Ed. 874.

In consideration of the foregoing, the judgment of the district court is reversed, and the complaint dismissed.

DENMAN, Chief Judge (concurring in the result).

The determining question in this case is whether Rosenberg Bros., in fixing the amounts of its bids to sell to the Commodity Credit Corporation raisins which it did not then have, can rely on that Corporation's statement on September 5, 1947, that it intended to purchase "a maximum of * * * 61,000 tons of [Thompson seedless] raisins" conditioned by the following, "if the purchase of this total quantity * * * is necessary to provide outlets for the relatively large 1947 production."

If such a statement had been made by a private corporation having a wide market control, it well could be argued that having made bids a dealer like Rosenberg Bros. could hold the corporation liable if, after accepting a bid it then proceeded so to increase its purchases that the costs of the raisins to Rosenberg were thereby increased. In such a situation, Rosenberg might be entitled to recover damages based upon the cost to it of the raisins if the 61,000 ton representation had been complied with.

However, the Commodity Credit Corporation is not such an ordinary buyer. It is a government institution whose duty with respect to the Thompson seedless raisin industry is stated by Congress in the Act creating it to be that of "stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities * * * and of facilitating the orderly distribution"[1] thereof. It seems clear that the policy announced by Congress in this statute requires that the Corporation be free at all times to adjust and readjust its operations to changing conditions in order to achieve its objectives. Rosenberg is, of course, charged with knowledge of the governmental purpose of the Commodity Credit Corporation.

Here it is unquestioned that the statement of the anticipated limit of raisin purchases was made sometime before the harvesting had begun of the grapes to be later cured as raisins. It is obvious that the total quantity of raisins ultimately to be produced from the Thompson seedless grapes might differ from the amount on which the statement of September 5th was based. Likewise the foreign and domestic demand for such raisins against the competition of other dried fruits and confections might be so much less than expected as to require the purchase by the government of an even greater amount than that stated on September 5th, in which event it would be the duty of the governmental corporation to increase its purchases thereby "supporting and protecting farm income and prices". That is to say, the maximum quantity of Thompson seedless raisins to be purchased specified in the September 5th announcement well might prove to be insufficient and require eventual enlargement. So also the production may have been less or the foreign and domestic demand greater, requiring government purchase of a lesser amount than 61,000 tons.

All the above must be deemed obvious to a bidder offering to sell raisins under the request for bids later made by the Corporation, and hence such bidder must be deemed to have accepted the chance of lesser profit or loss by a decrease or a larger profit by an increase of the amount of Thompson raisins available for purchase.

It well may be that the action of the Corporation would warrant the unilateral rescission of the contracts of sale. That question, however, is not before us because instead of rescinding, Rosenberg Bros. proceeded to perform the contract and is not entitled to recover on the basis of the increased cost of the raisins, having entered, as stated, into the contracts charged with the knowledge of the obligation of the Corporation to increase or decrease its purchases should conditions so require.