[No. A041658. First Dist., Div. Four. Sept. 29, 1989.]

STORAGE SERVICES, Cross-complainant and Respondent, v. C.R. OOSTERBAAN et al., Cross-defendants and Appellants.

**COUNSEL**

Morgan, Lewis & Bockius, Paul A. Richler, Judith K. Otamura-Kester, Jeffrey N. Brown and Lee W. Cake for Cross-defendants and Appellants.

Turner & Mulcare, William J. Turner, Ronald J. Mulcare, Marer, Marer & Schuck, Gerald Z. Marer, Alan G. Marer and John F. Schuck for Cross-complainant and Respondent.

## OPINION

PERLEY, J.—First Marin Realty, Inc., a real estate broker, and C. R. Oosterbaan, a real estate agent, appeal from the judgment against them on the cross-complaint of Storage Services, a partnership, for fraud in connection with a real estate transaction, and from the orders denying their motions for judgment notwithstanding the verdict on the issue of punitive damages. Appellants argue that: substantial evidence of fraud was lacking; Storage Services did not "purchase or otherwise acquire" the property for purposes of its claim for lost profits; Storage Services did not acquire the property in reliance on the fraud; Storage Services waived its right to damages for the fraud; additional amounts should have been offset against the judgment; and the punitive damages were improper and excessive. We find that the punitive damages awarded against Oosterbaan were excessive, and that the punitive damage award against First Marin must be reversed for lack of evidence of its net worth. We affirm the judgment in all other respects.

### I. FACTS

#### A. *Fraud and Reliance*

Storage Services entered into a contract with Grocers Wholesale Co. in March of 1984 to purchase an undeveloped 81,000-square-foot lot at Weldon and Rickard Streets, San Francisco (the subject property) for $850,000. Storage Services intended to construct a mini-storage facility on the subject property, which lay adjacent to a five-acre parcel owned by the State of California where the California Department of Transportation (Caltrans) stored some equipment.

Oosterbaan acted as Grocers Wholesale's agent for purposes of the transaction. A few days before the contract was executed, Oosterbaan met with Michael Garrity of Storage Services and Nicholas Zibyock, Storage Ser-

vices' real estate agent. In response to a question from Zibyock, Oosterbaan indicated that Caltrans had no interest in the subject property.[1] Evidence of the state's interest in the subject property, and Oosterbaan's knowledge of that interest, may be outlined as follows.

Oosterbaan had been the listing agent for the subject property since March of 1983, and he had been talking with Caltrans's personnel about the subject property two or three times a month since July of 1983. A right-of-way agent in Caltrans's acquisition section, Mr. Moon, phoned Oosterbaan in July of 1983 to inquire about the subject property. Moon indicated to Oosterbaan that Caltrans was studying relocation of a maintenance station and that "if the studies so indicated, we would most likely be interested in purchasing the property." Thereafter, through at least March of 1984, Moon was in "constant contact" with Oosterbaan regarding the status of the state's studies and its interest in acquiring the subject property. During that time Moon never informed Oosterbaan that the state was not interested in the subject property. To the contrary, Moon "indicated that the study was progressing and we were attempting to get the necessary approvals."

Oosterbaan had also spoken with Moon's supervisor, Mr. Foote, on at least two or three occasions in 1983 and early 1984. Foote indicated to Oosterbaan that "yes, we were interested in the property for expanding our maintenance facility." Foote never told Oosterbaan that the state was not interested in the subject property, and there was "no doubt" in Foote's mind that Oosterbaan was apprised of the state's interest. Indeed, only a

---

[1] Oosterbaan's testimony about what was said reads as follows: "Did Mr. Zibyock in the presence of Mr. Garrity at that March 13, 1984, meeting expressly ask you whether there was any interest of Caltrans in the subject property? [¶] A. Yes. I believe he did. [¶] Q. What did you tell him? [¶] A. There was none. [¶] Q. You told them that there was no interest of Caltrans in the subject property; is that your testimony? [¶] A. In my experience there wasn't, no. [¶] Q. You meant no interest in trying to acquire or use the subject property; is that your testimony? [¶] A. That's correct. [¶] Q. You affirmatively represented to Mr. Garrity and Mr. Zibyock that Caltrans had no interest; is that your testimony? [¶] A. As my experience with Caltrans, there was no interest. [¶] Q. The question is, did you affirmatively represent that Caltrans had no interest to Mr. Garrity and Mr. Zibyock at that March 13th meeting? [¶] A. To the best of my knowledge at that time, that's correct . . . . [¶] MR. TURNER: Q. Did you tell Mr. Zibyock and Mr. Garrity at that March 13th meeting that the state had no interest at all in purchasing the property? [¶] A. At the time of that meeting, that's correct . . . . [¶] Q. You in fact affirmatively told them that Caltrans wasn't interested in the property; didn't you? [¶] A. At that time, that's correct. [¶] Q. Are you saying you sort of qualified it and said, 'they're not interested at this time'? [¶] A. Because my relationship with them earlier than that—[¶] Q. No. I'm asking you, sir, did you—is it your testimony that at that meeting with Mr. Garrity and Mr. Shaw, you said, 'there's no Caltrans interest at this time'? [¶] A. As I said earlier, that was my answer when they asked me the question." Garrity testified in pertinent part that Zibyock asked, " 'Well, are they [Caltrans] interested in buying the property?' and Mr. Oosterbaan said, 'No. They're not interested in the property.' "

month before his meeting with Garrity and Zibyock, Oosterbaan had written to another realtor that "Mr. Moon and Mr. Foote have expressed that you might have some interest in the [subject property] on behalf of Caltrans."

During this period Oosterbaan was associated with First Marin, where he worked under the supervision of First Marin's President, Douglas Engel. Engel met with Oosterbaan every week, and reviewed all of Oosterbaan's correspondence and contracts. Engel's duties included insuring that Oosterbaan's representations were accurate. When they first discussed the subject property, Engel had advised Oosterbaan that "the likely buyer is the State of California." Engel knew that Oosterbaan had been in contact with Caltrans' right-of-way agent, and he and Oosterbaan discussed the substance of the latter's conversation with Garrity and Zibyock.

Storage Services' witnesses testified that they would not have entered into the contract if they had known that the state was studying the subject property for possible acquisition or had any interest in acquiring it. Storage Services deposited $10,000 into escrow, paid an additional $20,000 to extend the close of escrow to September 20, 1984, and proceeded with arrangements to develop the subject property. Designs were drawn, site development work was performed and planning commission approval was obtained. Caltrans's interest surfaced in an August 31, 1984, letter from Moon to Grocers Wholesale, expressing the state's desire to purchase the subject property and its willingness, if necessary, to proceed by way of eminent domain. Storage Services thus learned of the state's intention to acquire the subject property prior to the scheduled close of escrow.

## B. *Acquisition of the Property*

On September 13, 1984, the title company wrote to Grocers Wholesale and Storage Services asking them to acknowledge the state's intention to acquire the subject property, and to hold the title company harmless from any claim arising from "closing the escrow relative to any condemnation action." Storage Services would not agree to this because it "was beyond what we were required to do in our purchase agreement." Storage Services wrote to Grocers Wholesale advising that it would not close as scheduled because there was "a title problem, and . . . it's the responsibility of Grocers Wholesale to deal with this title problem."

The state filed its complaint in eminent domain against Grocers Wholesale in February of 1985, deposited probable compensation (Code Civ. Proc., § 1255.010) of $850,000 in December of 1985, and took possession of

the subject property in March of 1986. Grocers Wholesale cross-complained against Storage Services to quiet title and Storage Services, in turn, cross-complained against Grocers Wholesale, Oosterbaan and First Marin for fraud and negligent misrepresentation. Throughout this time, Storage Services remained willing and able to complete the 1984 purchase contract "if and when Grocers Wholesale could perform as agreed."

Storage Services and Grocers Wholesale entered into a comprehensive settlement and mutual release in 1987. The settlement was "made with a view to a total consideration of $850,000 being payable to Grocers Wholesale for the property in late 1984." Grocers Wholesale received or retained, inter alia, the $850,000 deposited by the state, the $10,000 deposited by Storage Services in the original escrow, the $20,000 already paid by Storage Services, and an additional $50,000 from Storage Services. Storage Services received, inter alia, an assignment of all of Grocers Wholesale's right, title and interest in the subject property, including Grocers Wholesale's claim for compensation for the fair market value of the subject property in excess of $850,000,[2] and a $20,000 credit on account of its claim for damages. The settlement agreement recited that it was not intended to constitute a release of any of Storage Services' claims against Oosterbaan or First Marin.

Pursuant to the settlement, Grocers Wholesale executed a quitclaim deed to the subject property to Storage Services in November of 1987. Oosterbaan and First Marin received commissions on the sale.

## C. *The Verdict*

In response to special interrogatories, the jury found that Oosterbaan had knowingly or recklessly made an untrue representation as to a past or existing material fact, with an intent to defraud Storage Services and to induce Storage Services to rely on it, and that Storage Services, unaware of the falsity, acted in justifiable reliance on the truth of the representation. The jury also found that Oosterbaan was guilty of oppression, fraud or malice, and that First Marin had authorized or ratified the oppressive, fraudulent or malicious conduct of Oosterbaan. Judgment was entered against Oosterbaan and First Marin for $1,044,250, representing $1 million for lost profits,[3] plus $64,250 for expenditures, minus the $20,000 credited to

---

[2] The jury determined that the fair market value of the subject property was $1,241,258.50 as of the valuation date, and the court determined that the state was liable for litigation expenses of Storage Services in the amount of $355,617.07.

[3] A witness for Storage Services testified that it was unable to locate any comparable property after its plans for the subject property were thwarted. Storage Services' personnel further testified that they had undertaken comparable developments in the past, and that they would

Storage Services under its settlement agreement with Grocers Wholesale. The jury also awarded punitive damages of $75,000 against Oosterbaan and $150,000 against First Marin.

## II. DISCUSSION

### A. *There Was Substantial Evidence of Fraud*

 It is apparent from the foregoing summary of testimony supporting the judgment that there was substantial evidence of fraud. It is well settled that we "must consider the evidence in the light most favorable to the prevailing party, giving him the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 278, p. 289, italics omitted.)[4] Since it is not our prerogative to reweigh the evidence, we need not detail the 24 evidentiary points listed in appellants' opening brief. We have reviewed the evidence highlighted by Storage Services, and we are satisfied that a jury could find, on the basis of that evidence, that all of the elements of actionable fraud had been presented. (See *Okun* v. *Morton* (1988) 203 Cal.App.3d 805, 827-828 [250 Cal.Rptr. 220] [misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance and resulting damages].)

Although sufficiency of the evidence is not a close question in this case, we will briefly respond to the points raised in connection with this issue. Appellants' main point is apparently that fraudulent intent was lacking "because the State had never affirmatively indicated to Oosterbaan that it would purchase the property at any time before the meeting with Storage Services." The jury, however, could conclude that Oosterbaan knew the state was "interested" in the subject property even though Caltrans officials could make no commitment until the requisite funding was in place. Appellants also note that Storage Services could have contacted the state to find out what its position was. However, "[t]he recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation." (Rest.2d Torts, § 504; see also *Calmon* v. *Sarraille* (1904) 142 Cal. 638, 642 [76 P. 486] [contracting party may rely on express statement of existing fact known only to other side]; and *Messerall* v. *Rubin*

have anticipated profits of $2.5 million if they had been able to construct, operate and sell a mini-storage facility on the subject property.

[4] The contention that Storage Services' lost profits were speculative is untenable in light of this rule. Although Storage Services was evidently formed to acquire and develop the subject property, the jury could infer that its principals had successfully managed similar projects. (See fn. 3, *ante.*)

(1961) 195 Cal.App.2d 497, 500 [16 Cal.Rptr. 107] [contributory negligence no defense to intentional misrepresentation].)

B. *The Subject Property Was "Purchased" or "Acquired"*

■ Appellants argue that the award of lost profits was improper because Storage Services did not "purchase or otherwise acquire" the subject property for purposes of Civil Code section 3343, subdivision (a)(4).[5] Subdivision (a)(4) was added to section 3343 in 1971 as part of "an extensive amendment to and expansion of that portion of the former section dealing with consequential or 'additional' damages." (*Stout* v. *Turney* (1978) 22 Cal.3d 718, 727 [150 Cal.Rptr. 637, 586 P.2d 1228]; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1987) Torts, §§ 1441-1444 [describing development of the prior "out-of-pocket loss rule" for real estate fraud].) There are evidently no cases construing the words "purchase or otherwise acquire" as they appear in this statute.

Storage Services argues, as a matter of policy, that the words must be given a "broad and reasonable" construction to prevent injustice to a defrauded party, "lest the very definition itself furnish a finger-board pointing out the path by which [the statute] may be evaded." (Cf. *Sparks* v. *Sparks* (1950) 101 Cal.App.2d 129, 135 [225 P.2d 238].) Appellants note that the transfer of interest in this case does not fit neatly within certain dictionary definitions of the word "acquire," and that title to the subject property did not pass through escrow. But they do not explain why a statute designed to deter fraud should not receive a broad and reasonable construction. If the Legislature had intended to create a narrow definition, then presumably it would have avoided the flexibility inherent in the words "otherwise acquire."

---

[5] This subdivision reads as follows: "(a) One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following: [¶] . . . [¶] (4) Where the defrauded party has been induced by reason of the fraud to *purchase or otherwise acquire* the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud, provided that lost profits from the use or sale of the property shall be recoverable only if and only to the extent that all of the following apply: [¶] (i) The defrauded party acquired the property for the purpose of using or reselling it for a profit. [¶] (ii) The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property. [¶] (iii) Any loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it." (Italics added.)

We are persuaded that the somewhat unusual circumstances of this case amounted to a "purchase" or "acquisition" of the subject property within the meaning of the statute. Storage Services became the equitable owner when it entered into the purchase contract. (*Estate of Dwyer* (1911) 159 Cal. 664, 675 [115 P. 235].) Although it could be argued that Storage Services lost its equitable ownership when it declined to close on schedule (*ibid.*; see also *Mamula* v. *McCulloch* (1969) 275 Cal.App.2d 184, 193-194 [79 Cal.Rptr. 571]), it did not rescind the contract and it eventually received Grocers Wholesale's legal title (see *Redevelopment Agency* v. *Gilmore* (1985) 38 Cal.3d 790, 800 [214 Cal.Rptr. 904, 700 P.2d 794] [title does not pass to state until final order of condemnation recorded]). If appellants did not believe that the subject property had been purchased or otherwise acquired, then presumably they would not have accepted commissions on the transaction.

When Storage Services inquired about the state's interest, it was evidently concerned about the possibility of a condemnation proceeding. Appellants' misrepresentation suggested that the subject property would not be condemned. They now seek to take advantage of the condemnation insofar as it prevented Storage Services from obtaining full legal title. Citing *Gilmore, supra,* 38 Cal.3d 790, appellants argue that no purchase or acquisition occurred because, by the time the subject property was deeded to Storage Services, Grocers Wholesale was only entitled to the fair market value of the subject property, not the property itself. We do not believe that Storage Services should be deprived of its statutory remedy because the title it acquired did not entitle it to possession. Such a ruling would, in effect, enable appellants to profit from their own wrong. (See Civ. Code, § 3517.)

C. *Storage Services Relied on the Fraud*

Appellants advance two arguments for the proposition that reliance was lacking in this case. ■ They contend first that Storage Services' reliance was unjustified because Oosterbaan's statement was in the nature of an opinion as to a third party's future action. (See *Borba* v. *Thomas* (1977) 70 Cal.App.3d 144, 152 [138 Cal.Rptr. 565].) The jury, however, could reasonably conclude that Zibyock's question concerned the state's present interest, and that Oosterbaan's response was a misrepresentation of an "existing" material fact, rather than a prediction about what the state might do in the future.

■ Appellants also argue that, since any purchase or acquisition of the subject property occurred pursuant to the settlement agreement, which was executed after the fraud had been discovered, Storage Services cannot claim

it acquired the subject property in reliance on the fraud. It is not entirely clear under the statute when the requisite reliance must occur. The statute begins with the statement that the defrauded purchaser must be "induced by reason of the fraud to purchase or otherwise acquire the property." (Civ. Code, § 3343, subd. (a)(4).) This suggests that the purchase or acquisition must be completed in reliance on the fraud. But the statute further states that the defrauded party must have "reasonably relied on the fraud in entering into the transaction." (Civ. Code, § 3343, subd. (a)(4)(ii).) This suggests that fraud at the inception of the transaction is sufficient.

■ Appellants cite no authority indicating that the statute was intended to abrogate the well-established rule that "[w]hen a party learns that he has been defrauded, he may, instead of rescinding, elect to stand on the contract and sue for damages." (*Bagdasarian* v. *Gragnon* (1948) 31 Cal.2d 744, 750 [192 P.2d 935]; see also Annot. (1985) 40 A.L.R.4th 627, 631 [defrauded real property purchaser may elect to rescind or affirm contract]; and Cal. Real Property Remedies Practice (Cont.Ed.Bar 1982) p. 14 [same].) Even though a party who elects to affirm a contract will not be completing it in "reliance" on the fraud, "his continued performance of the agreement does not constitute a waiver of his action for damages." (*Bagdasarian* v. *Gragnon, supra,* at p. 750.) The element of reliance, as appellants describe it, will always be missing when a party elects to affirm a contract and sue for fraud.

■ Appellants contend, however, that Storage Services was not entitled to affirm the contract because rescission would have been an adequate remedy. (See *Thompson Crane & Trucking Co.* v. *Eyman* (1954) 123 Cal.App.2d 904, 910-911 [267 P.2d 1043] [defrauded party may affirm contract "where rescission would not afford an adequate remedy"]; see also *Stevens* v. *Curtis* (1953) 122 Cal.App.2d 30, 35 [264 P.2d 606]; and *Rothstein* v. *Janss Investment Corp.* (1941) 45 Cal.App.2d 64, 69 [113 P.2d 465].) Storage Services could not, as a practical matter, "mitigate" the losses occasioned by appellants' fraud,[6] and it could not have obtained the anticipated return on its investment of time, energy and money through rescission. Since Storage Services had proceeded so far with its plans that rescission would have afforded an inadequate remedy, it was entitled to affirm the contract. (*Stevens* v. *Curtis, supra,* at p. 35; *Rothstein* v. *Janss Investment Corp., supra,* at p. 69.)

---

[6]Michael Shaw testified on behalf of Storage Services as follows: "Q. Were you able to replace or otherwise make up for the loss of your time, effort and expense or the loss of anticipated profits from use or sale of this property? [¶] A. No, we were not. [¶] Q. And why not? [¶] A. Because, as has been the case in all of our development, it takes a while to obtain your approvals in any San Francisco Bay Area community. This was the approval that we had sought and obtained in 1984 for construction in 1985. [¶] As a consequence of our failure to be able to build this facility in 1985, we were left without inventory for that year."

■ The question, then, is whether the settlement between Storage Services and Grocers Wholesale may fairly be viewed as an "affirmation" of the original contract.

### D. *Storage Services Did Not Waive the Fraud*

Appellants contend that the settlement agreement was not an affirmation of the contract, and that Storage Services waived the fraud when it entered into the settlement. They cite *Schied* v. *Bodinson Mfg. Co.* (1947) 79 Cal.App.2d 134 [179 P.2d 380], for the proposition that entry into a "new arrangement" with knowledge of fraud is tantamount to a waiver of the fraud.[7] The opinion in *Schied* states inter alia that "when a party claiming to have been defrauded, enters, after discovery of the fraud, into new arrangements or engagements concerning the subject-matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud." (*Schied* v. *Bodinson Mfg. Co., supra,* at pp. 142-143, italics deleted.) Appellants argue that the settlement was such a "new arrangement," characterizing it as a "sham" that enabled Storage Services, under the guise of affirming the contract, to acquire the subject property without paying for it.

As we read *Schied,* a "new arrangement" effected with knowledge of fraud is not tantamount to waiver of the fraud unless it grants significant concessions to the defrauded party. A waiver is properly inferred in that situation because such concessions represent compensation for the fraud. As *Schied* indicates: "a party to an executory contract, who, with full knowledge of the facts constituting the fraud complained of, subsequently, with intention to do so, affirms the contract and recognizes it as valid, either by his written agreement or by acts and conduct, *and accepts substantial payments, property or the performance of work or labor not required by the*

---

[7] Appellants also cite *Commodity Credit Corp.* v. *Rosenberg Bros. & Co.* (9th Cir. 1957) 243 F.2d 504, and both sides appeal to *Smith* v. *Roach* (1975) 53 Cal.App.3d 893 [126 Cal.Rptr. 29]. Neither of those cases is pertinent to our analysis. *Commodity Credit Corp.* contains language to the effect that a party who learns of fraud and nonetheless, "without necessity," proceeds with a "wholly executory" contract is deemed to have waived the fraud. (*Commodity Credit Corp.* v. *Rosenberg Bros. & Co., supra,* at p. 512.) As previously noted, the contract was not "wholly executory" when the fraud was discovered and Storage Services was not bound to opt for an inadequate remedy of rescission. This Ninth Circuit case was not in any event a fraud case and we are not bound to accept its dicta. The defrauded plaintiffs in *Smith* v. *Roach* argued that they had affirmed the contract, and were held not to have waived the defendants' fraud just because they had attempted to mitigate their losses through a "new agreement" with a third party. Since we conclude that the settlement agreement was an affirmation of the original contract, we need not reach Storage Services' argument that the settlement was a "third party" agreement within the meaning of *Smith* v. *Roach* from the standpoint of the seller's broker and agent.

*original contract,* thereby waives his right to damages on account of the fraud." (*Schied* v. *Bodinson Mfg. Co., supra,* 79 Cal.App.2d at p. 142, italics added.) Thus, a waiver could have been predicated in *Schied* on the defrauded purchaser's "accepting from the seller, and profiting by, repairs, work, labor and machinery of substantial value which were not required by the terms of the contract." (*Ibid.*)

Storage Services did not receive substantial concessions under the settlement agreement, and the agreement was not a "sham" just because Storage Services did not have to go out-of-pocket for the original purchase price. Since Storage Services would have received the state's $850,000 deposit if it had proceeded with the acquisition in 1984, it in effect "paid" that amount for the subject property in 1987. The settlement placed the parties in essentially the same positions as the original contract. Grocers Wholesale received the bargained-for purchase price, and Storage Services obtained the right to the fair market value of the subject property in excess of $850,000, just as it would have had it acquired the subject property under the contract. Storage Services in effect received an extension of time to close, but we find that concession, in light of the balance of the settlement agreement, to be insubstantial as a matter of law.[8] We conclude that the settlement was an affirmation of the original contract.

### E. *Appellants Were Not Entitled to an Additional Offset*

In accordance with Code of Civil Procedure section 877, subdivision (a), appellants received a $20,000 offset against the jury's verdict for the amount credited to Storage Services under the settlement agreement for its tort claims. ■ Appellants contend that they were entitled to an offset of "all of the benefits" received by Storage Services as a result of the settlement, including the balance of the fair market value of the subject property and the litigation expenses awarded to Storage Services in the condemnation proceeding, and not just the amount "conveniently allocated" for fraud. The argument is evidently that since Storage Services did not include a claim for specific performance of the purchase contract in its cross-complaint against Grocers Wholesale, the only claims pending between the parties at the time of settlement were fraud claims, and hence that all benefits to Storage Services under the settlement were on account of the fraud.

---

[8] The trial court therefore properly denied appellants leave to file an amended answer to the cross-complaint to add affirmative defenses of waiver and estoppel based on the settlement agreement, and it did not err in keeping the waiver issue from the jury. Since there was no issue of fact associated with the settlement agreement, and the jury could have been confused by Storage Services' payment for the subject property with the state's deposit, it was not an abuse of discretion to exclude evidence of the settlement under Evidence Code section 352.

The parties' rights under the purchase contract, however, were also at issue at the time of the settlement. Grocers Wholesale's cross-complaint to quiet title and for breach of contract was still pending, along with Storage Services' tort claims. The agreement resolved both the tort and the contract claims, and we find no grounds for reallocating the consideration paid for their settlement. Appellants received the appropriate offset.

## F. *Punitive Damages*

### (1) *Appellants Were Not Denied Due Process*

We reject appellants' threshold claim that they were denied due process because the jury was given "virtually unlimited discretion" to award punitive damages. The jury's discretion was tempered by instructions to avoid passion or prejudice, and to consider the reprehensibility of the conduct and the amount which would have a deterrent effect in light of appellants' financial condition. The jury was also instructed that punitive damages must bear a reasonable relation to actual damages. We decline the invitation to be the first court in this state to rule that such instructions do not afford due process. (See *Radell* v. *Comora* (1989) 211 Cal.App.3d 1244, 1257-1260 [259 Cal.Rptr. 891] [rejecting due process argument].)

### (2) *Against Oosterbaan*

Oosterbaan contends that the punitive damages assessed against him were not supported by the evidence, but we have already determined that there was substantial evidence of fraud, and fraud was a sufficient basis for the award. (Civ. Code, § 3294, subds. (a) and (e); see *Walker* v. *Signal Companies* (1978) 84 Cal.App.3d 982, 996 [149 Cal.Rptr. 119].) He also argues that the punitive damages awarded against him were excessive as a matter of law. We agree.

An important consideration in assessing punitive damages is the wealth of the defendant. (*Devlin* v. *Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381, 390 [202 Cal.Rptr. 204].) There was apparently no evidence of Oosterbaan's net worth apart from his testimony that his net worth was $150,000-$200,000 as of about 1985. Oosterbaan's statement that he "hoped" his net worth was greater as of the time of trial (Dec. 1987) does not support an inference of significantly greater net worth because he testified that his gross income was only: $100,000 in 1985, $80,000 in 1986, and $52,000-$58,000 in 1987. Storage Services introduced no evidence that Oosterbaan's net worth

was in excess of $150,000-$200,000.[9] (See *Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262 [262 Cal.Rptr. 311] [plaintiff bears burden of proof of defendant's financial condition]; see also *Barragan* v. *Banco BCH* (1986) 188 Cal.App.3d 283, 302 [232 Cal.Rptr. 758]; and *Forte* v. *Nolfi* (1972) 25 Cal.App.3d 656, 688-689 [102 Cal.Rptr. 455].) Thus, according to the evidence, the $75,000 punitive damage award represented at least 33 percent of Oosterbaan's net worth, and it exceeded his gross income in the year of trial.

An appendix in *Devlin, supra,* 155 Cal.App.3d 393-396, sets forth punitive damages as percentages of net worth in a sampling of 16 cases from 1950-1984. This survey indicates that punitive damage awards are generally not allowed to exceed 10 percent of the defendant's net worth, and that significantly lower percentages are indeed the norm. Although *Devlin* notes that calculation of punitive damages is a "fluid process" that "does not involve strict adherence to a rigid formula," our review of the precedents indicates that the award against Oosterbaan exceeds the permissable "range of reasonableness." (*Id.,* at pp. 390-391; see *Burnett* v. *National Enquirer, Inc.* (1983) 144 Cal.App.3d 991, 1011-1012 [193 Cal.Rptr. 206, 49 A.L.R.4th 1125] [award equalling 35 percent of net worth excessive]; *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 469-470 [136 Cal.Rptr. 653] [award equalling 15 percent of net worth excessive]; and *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [130 Cal.Rptr. 416] [award exceeding 30 percent of net worth excessive].) Storage Services cites *Greenfield* v. *Spectrum Investment Corp.* (1985) 174 Cal.App.3d 111, 124 [219 Cal.Rptr. 805], which upheld a $42,500 punitive damage award against an individual who was "making $2,000 per month and owned an automobile." But Oosterbaan's conduct was not comparable to that of the defendant in *Greenfield,* who had severely beaten the plaintiff with a series of kicks and judo chops.

Although the award represented only a fraction of the compensatory damages, "the function of punitive damages is not served by an award which, in light of the defendant's wealth and the gravity of the particular act, exceeds the level necessary to properly punish and deter." (*Neal* v.

---

[9] Citing *Campbell* v. *McClure* (1986) 182 Cal.App.3d 806, 808 [227 Cal.Rptr. 450]; and *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 122 [135 Cal.Rptr. 802], Storage Services contends that Oosterbaan waived his right to challenge the award as excessive because he did not specifically argue the point in his motions for new trial and for judgment notwithstanding the verdict. "[W]here the ascertainment of the amount of damage requires resolution of conflicts in the evidence or depends on the credibility of witnesses, the award may not be challenged for inadequacy or excessiveness for the first time on appeal." (*Glendale, supra,* at p. 122.) There was no waiver because Oosterbaan's argument does not involve conflicting testimony or issues of credibility.

*Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928 [148 Cal.Rptr. 389, 582 P.2d 980].) ▨ Where, as here, the award represents a disproportionate share of the defendant's net worth, it is presumptively the result of passion and prejudice and cannot be sustained. (See *Little* v. *Stuyvesant Life Ins. Co., supra,* 67 Cal.App.3d at p. 469.)

### (3) *Against First Marin*

▨ First Marin argues that there was insufficient evidence to support an award of punitive damages against it because there was no showing that it "ratified or approved" Oosterbaan's fraud. The jury, however, could infer such ratification or approval based on Engel's close supervision of Oosterbaan, his familiarity with the subject property, his knowledge that Oosterbaan had spoken with Caltrans's representatives, and his conversation with Oosterbaan about the substance of the latter's meeting with Garrity and Zibyock. (See *Pusateri* v. *E. F. Hutton & Co., Inc.* (1986) 180 Cal.App.3d 247, 250 [225 Cal.Rptr. 526].)

▨ First Marin also contends that the award must be reversed for lack of evidence of its net worth. (See *Dumas* v. *Stocker, supra,* 213 Cal.App.3d 1262, [plaintiff's failure to introduce evidence of defendant's wealth renders punitive damage award unsupported by the evidence]; see also *Barragan* v. *Banco BCH, supra,* 188 Cal.App.3d 283; and *Forte* v. *Nolfi, supra,* 25 Cal.App.3d 656.) ▨▨▨ ▨ ▨ Storage Services responds that we should follow *Vossler* v. *Richards Manufacturing Co.* (1983) 143 Cal.App.3d 952, 961-965 [192 Cal.Rptr. 219] [plaintiff has no obligation to introduce evidence of defendant's financial condition when seeking punitive damages].[10] We have reviewed *Dumas* and *Vossler* and the California cases upon which they rely, and we are persuaded that *Dumas* sets forth the better rule. There is no basis for meaningful appellate review of a punitive damage award without evidence of the defendant's financial condition. Plaintiffs generally bear the burden of proving their entitlement to damages and there is no reason, in light of discovery and subpoena powers, to shift the burden of proof on the issue of the defendant's wealth.

---

[10] Storage Services also argues that First Marin waived any objection based on lack of evidence of its wealth because it did not raise the issue on appeal until after briefing had been completed and the decision in *Dumas* v. *Stocker, supra,* 213 Cal.App.3d 1262 was filed. Such a waiver may be inferred where the defendant does not contend, either in the trial court or on appeal, that the award was excessive in light of its financial status. (*Hanley* v. *Lund* (1963) 218 Cal.App.2d 633, 646 [32 Cal.Rptr. 733].) First Marin preserved the issue in its motion for judgment notwithstanding the verdict, where it argued inter alia that there was no evidence of its wealth from which the jury could reasonably assess the amount of punitive damages to be imposed.

Accordingly, in the absence of any evidence of its wealth, the punitive damage award against First Marin must be reversed.

### III. Disposition

The judgment is affirmed except that the punitive damage awards against Oosterbaan and First Marin are vacated and the matter is remanded for a new trial on those issues only, provided that if Storage Services, within 30 days from the date of our remittitur, files with the clerk of this court and serves upon Oosterbaan a written consent to a reduction of the punitive damage award against Oosterbaan to the sum of $20,000, the judgment will be modified to award Storage Services punitive damages against Oosterbaan in that amount, and as so modified and except insofar as it awards punitive damages against First Marin, affirmed in its entirety. (See *Burnett* v. *National Enquirer, Inc., supra,* 144 Cal.App.3d at pp. 1018-1019.) The parties shall bear their own costs on appeal.

Anderson, P. J., and Channell, J., concurred.

Appellants' petition for review by the Supreme Court was denied December 14, 1989.