Filed 9/29/15  Santiago v. Anderson CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARIO DE SANTIAGO,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>BRUCE C. ANDERSON et al.,<br><br>     Defendants and Appellants. | G050430<br><br>(Super. Ct. No. 30-2012-00583445)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gail Andrea Andler, Judge.  Affirmed.

Richard V. McMillan for Defendants and Appellants.

La Jolla Law Group, Kent L. Sharp, and Brien J. O'Meara for Plaintiff and Respondent.

\*          \*          \*

Bruce C. Anderson, Salvador Bracamontes, and Isela Ibarra appeal from a judgment awarding Mario De Santiago $180,000 in joint and several damages against them as coconspirators in a fraudulent scheme to invest in a Nevada gold mine, plus

$36,000 in loan carrying costs and $109,650 in prejudgment interest. Bracamontes challenges the sufficiency of the complaint and the evidence to support that damages figure in a default judgment against him. Defendants also challenge the allocation of damages among them and assert various statutes of limitations precluded judgment for plaintiff. Anderson, as the primary conspirator, also challenges the trial court's $500,000 punitive damages award against him. As we explain, none of these contentions has merit, and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In 2007, plaintiff decided to aid his brother, Joel De Santiago, in acquiring a home in Delano, California because Joel's credit was poor. Plaintiff purchased the home in his name on his brother's behalf, and Ibarra acted as the real estate agent for both the buyer and the seller.

Aware that plaintiff had substantial equity in the home and good credit, Ibarra and her coconspirators, Anderson and Bracamontes, lured plaintiff into investing in a Nevada gold and marble mine. Ibarra claimed she invested $150,000 of her own money in the mine, and she told plaintiff to expect to triple his money on any funds he invested. Plaintiff agreed to meet with her about the mine, and Ibarra brought Bracamontes to their first meeting in October 2007. Both Ibarra and Bracamontes claimed they put $150,000 into the mine, which was doing business as Kinsley Resources, Inc. (Kinsley), and they promised again a 300 percent return on his investment and that he could turn those profits in as little as a year.

The duo met plaintiff again in November 2007, continuing to pique his interest, and they arranged a third meeting in December 2007 with Anderson, Kinsley's owner. The trio showed him Kinsley's business plan and a disc filled with supporting data. They informed him the mine was worth billions of dollars, that he could triple his money, and that they were in the process of selling interests to major stakeholders and

2

obtaining institutional loans to develop the property. Anderson confirmed Ibarra and Bracamontes both invested $150,000 of their own funds.

When plaintiff expressed reluctance and noted he did not have that sum, Ibarra and Anderson advised him to tap the equity in the home he just purchased. Ibarra calculated plaintiff could draw out $193,000, invest $150,000 with defendants, and service the loan with the remaining $43,000. Ibarra drew up the paperwork to obtain the loan, plaintiff signed it, and plaintiff also signed the necessary security documents Anderson presented to invest $150,000 in the mine. Plaintiff wired the $150,000 to Kinsley as instructed by Anderson. Days later, Bracamontes obtained an additional $20,000 loan from plaintiff based on the representations that he (Bracamontes) had ample assets invested in the mine.

Plaintiff contacted defendants periodically and they assured him they were proceeding in developing the mine, making progress with major investors and lenders, and that his patience would be rewarded handsomely. Unknown to plaintiff, however, Anderson was not developing the property or securing institutional funding, but rather swindling other individual investors like plaintiff. Plaintiff contacted Anderson in February 2009 and he perpetuated the ruse, issuing an update letter that painted a rosy picture that named institutional buyers and lenders who would make the mine a success. Anderson assured plaintiff his investment was safe, he would triple his money, and that major lenders and entities interested in purchasing the property were actively pursuing Kinsley to develop the mine. None of these statements or those that induced plaintiff to make his initial investment were true. Nor had Ibarra or Bracamontes or even Anderson himself invested any money in the mine. Defendants continued to make misstatements with monthly and yearly updates.

As the trial court explained in its statement of decision, "Defendants continually and repeatedly, over a period of years, both orally and in writing, represented to plaintiff that the said investment was safe and secure, and that plaintiff was going to

3

receive three times his investment. Ultimately, plaintiff received nothing and then filed the [c]omplaint," which Anderson and Ibarra answered, but Bracamontes defaulted. Plaintiff's complaint included allegations of securities fraud, intentional misrepresentation and deceit, negligent misrepresentation, fraud, breach of fiduciary duty, and breach of contract. The court found that defendants "were co-conspirators in a scheme designed to defraud plaintiff into having him believe that plaintiff and defendants were all a family, that plaintiff had more than enough money to invest in Kinsley Resources, Inc. by taking out a second mortgage on his home, and to have plaintiff believe that all defendant Anderson wanted to do was to help people. [¶] The Court finds that defendant Anderson, with the assistance of defendants Ibarra and Bracamontes, conspired to prey on plaintiff and that . . . defendants used their position of trust and their misrepresentations to plaintiff in order to have him invest his money in defendants' fraudulent scheme. This fraudulent scheme by defendants was established to the Court by more than a preponderance of evidence, and even more than clear and convincing evidence that defendants' conduct was fraudulent, deceitful, and that their misrepresentations resulted in plaintiff's damages."

II

DISCUSSION

A.      *Default Judgment Against Bracamontes*

Bracamontes challenges the sufficiency of the complaint and the evidence to support the default judgment against him. Review of a default judgment is limited to questions of jurisdiction, sufficiency of the pleadings, and excessive damages. (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 824.) A default "confesses" the facts alleged in the complaint; accordingly, "they are treated as true" for purposes of the default judgment. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 281, italics omitted.) But if the facts "do not state any proper cause of action, the default judgment in the plaintiff's favor cannot stand." (*Id.* at p. 282.)

4

On the breach of contract claim, Bracamontes contends that by failing to specify the due dates on the sums plaintiff loaned him, plaintiff's complaint failed to allege the loans were overdue. But no special form of pleading is required. Plaintiff alleged as to both the $20,000 and $10,000 loans that Bracamontes had breached his duty to repay the loans; specifically, Bracamontes had "failed, and continues to fail, to payoff the same." These allegations asserted a breach of the loan agreements, and Bracamontes's failure to answer the complaint admitted the breach. Nothing more was required.

Bracamontes also argues the allegations in the complaint do not support the $325,650 in joint and several damages the trial court awarded against him. "The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint . . . ." (Code Civ. Proc., § 580, subd. (a).) Bracamontes asserts the trial court's award of $36,000 in loan carrying costs was unfounded anywhere in the complaint. To the contrary, however, plaintiff alleged in his complaint that $43,000 was necessary "to service the loan" that defendants induced him to take out to invest in their scheme.[1]

---

[1] We note the trial court may have awarded plaintiff only $36,000 in carrying costs instead of $43,000 because plaintiff spent $13,000 of the $193,000 of borrowed home equity funds on home improvements. The remaining $180,000 went to defendants' gold mine scheme, consisting of the $150,000 plaintiff invested in bogus mine securities and the $20,000 and $10,000 loans he made to Bracamontes based on Bracamontes's claimed confidence in his own asserted investments in the gold mine. Of course, plaintiff would not be entitled to carrying costs for the $13,000 he spent on home improvements. Defendants argue the $36,000 in carrying costs should be reduced to account for monthly home equity loan payments attributable to the $13,000, but they provide no explanation, argument, citations to the record, or evidence to suggest the trial court did not already factor in that sum by awarding plaintiff $36,000 instead of the complaint's alleged $43,000 in loan costs. Because we must make all presumptions in favor of the judgment (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*)), plaintiffs have failed their burden on appeal to demonstrate error requiring further reduction of the $36,000. Consequently, their related argument for a reduced total sum of prejudgment interest based on reduced carrying costs also fails.

5

Similarly, the total damage figure of $325,650 is supported by the allegations of the complaint.  Plaintiff did not specify a total or exact figure in his prayer for damages, but instead simply that damages would "be proven at [the] time of trial or judgment." Nevertheless, a prayer for "damages according to proof" is sufficient to support a default judgment award if specific damage amounts are alleged in the body of the complaint.  (*Becker v. S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 494.) Plaintiff's complaint alleged damages of at least $180,000 and as high as $185,000 based on the home equity sums he withdrew to advance to the defendants, *not* including the servicing costs. Plaintiff also expressly sought prejudgment interest, and there is no dispute that with prejudgment interest, the $180,000 loan amount and $36,000 in carrying costs resulted in at least $325,650 in damages.  The complaint's factual allegations, admitted as true by Bracamontes's default, therefore support the damage award and Bracamontes's challenge fails.

B.      *Damages Allocation Among Defendants; Statutes of Limitations*

Ibarra and Anderson contend they were not liable jointly and severally on deceit or misrepresentation grounds for the $30,000 plaintiff loaned to Bracamontes. Ibarra and Bracamontes raise the seemingly unrelated claim that certain causes of action against them were barred by applicable statutes of limitations.  As we explain, the trial court's conspiracy finding renders each of these disparate challenges meritless.

First, it is true that plaintiff dismissed Ibarra and Anderson from his fifth cause of action against Bracamontes for breach of *contract* for failure to repay the $30,000 in loans he extended to Bracamontes.  But that does not mean the trial court could not find Ibarra and Anderson liable for the $30,000 based on plaintiff's allegations of deceit and misrepresentation.  Simply put, the trial court found that the loan to Bracamontes was part and parcel of the three defendants' goldmine scheme to defraud plaintiff.  As the trial court observed, "Mr. Anderson preyed on Mr. De Santiago with the

6

able assistance of Ms. Ibarra and Mr. Bracamontes, who used their position of trust, had used their ethnicity by saying, basically: We Mexicans need to do this in order to get ahead; by saying: We'll be family. We're a part of it. You can be a part of it. We're investing our money. We invested our family's money. [¶] This was a scheme. It was established to the court by more than the burden of proof . . . ."

The trial court reasonably could conclude plaintiff would not have made the loans to Bracamontes without Ibarra's and Anderson's false assurances that the gold mine was a foolproof investment. As alleged in the complaint, Bracamonte induced plaintiff to lend him the $30,000 based on Bracamonte's guaranteed ability to repay the amount based on *his* (Bracamonte's) mine investment. These assurances would have carried no weight without Ibarra and Anderson vouching for the mine. The trial court also could conclude the $30,000 in loans was not a distinct and separate fraud perpetrated solely by Bracamontes, but rather an integral part of a larger fraud to extract as much money as possible from plaintiff. In particular, defendants worked together to extol the false financial virtues of the mine, and plaintiff's loans to Bracamontes followed quickly on the heels of his mine investment. This coordinated timing suggests a concerted effort by the defendants to get plaintiff to give Anderson $150,000 on December 14, 2007, in return for worthless mine securities and then almost immediately to loan Bracamontes $20,000 on December 29, 2007, based on his strong financial position in the mine.

Additionally, Ibarra and Anderson continued to reassure plaintiff about the mine, which the trial court could conclude induced plaintiff to lend Bracamontes the remaining $10,000 in August 2008. It is unnecessary, and often impossible, "'to show that the parties met and actually agreed'" or "'arranged a detailed plan'" constituting a conspiracy. (*People v. Steccone* (1950) 36 Cal.2d 234, 238.) Instead, the "'conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134-1135.) "Whether an individual conspirator's act was committed in

7

furtherance of the conspiracy is a question of fact." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312.) Here, the trial court found the loans Bracamontes obtained were part of the larger conspiracy to defraud plaintiff, and we are in no position to second-guess that factual determination. Each individual in a fraudulent conspiracy is jointly and severally liable for the full amount of damages. (*Younan v. Equifax* (1980) 111 Cal.App.3d 498, 508; *Saporta v. Barbagelata* (1963) 220 Cal.App.2d 463, 474.) The trial court therefore properly included the $30,000 in loans as damages against all three defendants.

Similarly, the trial court's conspiracy finding defeats Ibarra's and Bracamontes's statutes of limitations defenses. Ibarra notes that plaintiff surmounted the three-year statute of limitations for his fraud claim on his initial investment in the gold mine in 2007 by pointing to later false assurances by the defendants that wealthy third parties were about to buy into the mine, thereby continuing and concealing their scheme and dissuading plaintiff from withdrawing his investment or suing earlier. Ibarra claims that because plaintiff specified additional misstatements only by Anderson and Bracamontes, her alleged participation in the initial $150,000 investment fraud fell outside the three-year statute of limitations. (Code Civ. Proc., § 338.) To the contrary, however, there was no evidence Ibarra withdrew from the conspiracy to defraud plaintiff or that the conspiracy had terminated.

Whether a particular conspiracy has ended is a question for the trier of fact based on the "'unique circumstances and the nature and purpose of the conspiracy.'" (*People v. Hardy* (1992) 2 Cal.4th 86, 143.) The trial court reasonably could conclude the nature of the conspiracy required a continuing effort to deceive plaintiff about the mine's prospects because defendants had promised plaintiff a quick return on his investment. Accordingly, Ibarra's participation in the conspiracy rendered her liable for the acts of her coconspirators continuing the fraud. Because a fraud action is "not deemed to have accrued until the discovery, by the aggrieved party, of the facts

8

constituting the fraud" (Code Civ. Proc., § 338, subd. (d)), the statute of limitations did not expire for any of the members of the conspiracy.

Bracamontes's invocation of the statute of limitations for a breach of contract similarly fails. He asserts that because his initial loan was due on January 28, 2008, and plaintiff did not file his complaint until July 13, 2012, plaintiff's breach of contract claim against him fell outside the four-year statute of limitations. (Code Civ. Proc., § 337.) But the trial court awarded damages against defendants based on their participation in a fraudulent scheme to defraud plaintiff, not breach of contract. As noted, the statute of limitations for fraud was tolled by defendants' continuing misrepresentations. Moreover, by defaulting Bracamontes waived any limitations period, which, as an affirmative defense, "must be affirmatively pleaded, by demurrer or answer. If it is not so pleaded, its benefits are waived." (43 Cal.Jur.3d (2015) Limitation of Actions, § 229, fns. omitted.) Bracamontes's challenge therefore fails.

C.    *Punitive Damages Against Anderson*

Anderson challenges the $500,000 in punitive damages the trial court awarded against him. He contends the trial court erroneously admitted evidence from the gold mine's bankruptcy reorganization showing the mine was worth $106 million and that Anderson owned a 30 percent interest in the mine, in addition to any portion he might inherit from his recently deceased father. Anderson contends the information was irrelevant hearsay. But the bankruptcy schedules that Anderson signed as a co-owner of the mine reflected comparatively small liabilities of $12 million, leaving a net worth of $94 million, or more than $30 million for Anderson personally. The information therefore was relevant to assessing Anderson's financial condition. Anderson confirmed these figures and his ownership percentage in his testimony at trial. Anderson argues the trial court erroneously believed plaintiff had pleaded in his complaint that Anderson operated the mine as his alter ego, but Anderson does not dispute the trial court's implicit

9

conclusion Anderson did so. We must presume the evidence supports this conclusion (*Denham, supra*, 2 Cal.3d at p. 564), and therefore the schedules Anderson signed and submitted under penalty of perjury were admissible as party admissions. (Evid. Code, § 1220.)

Anderson also challenges the sufficiency of the evidence to support his ability to pay the $500,000 award. When a defendant's financial ability to pay is measured in terms of net worth, punitive damage awards in excess of 10 percent of a defendant's net worth are generally considered excessive. (*Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 515; see *Merlo v. Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 18 [30 percent of net worth held "so greatly disproportionate . . . that [award was] presumptively based upon passion or prejudice"].)

Net worth, however, is not a definitive standard or even required, since that figure is easily manipulated, including here where Anderson ignored discovery concerning his finances. (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065 & fn. 3.) In *Adams v. Murakami* (1991) 54 Cal.3d 105 (*Adams* ), the Supreme Court held "meaningful" evidence of a defendant's financial condition is necessary to sustain an award of punitive damages and the burden rests on the plaintiff to introduce such evidence. (*Id*. at pp. 108-109.) Absent the evidence, there is no way to determine whether an award is disproportionate to the defendant's ability to pay, and therefore excessive. (*Id*. at p. 109.) The purpose of punitive damages "is to deter, not to destroy." (*Id*. at p. 112.)

*Adams* was a personal injury case in which no "financial evidence of any kind" was introduced at trial. (*Adams*, supra, 54 Cal.3d at p. 116, fn. 7.) That is not the case here, where Anderson verified in his testimony his ownership share in the gold mine and that the value of his share exceeded $30 million. The trial court reasonably could impose a punitive damages award of less than two percent of the very asset Anderson used to swindle plaintiff. The trial court also reasonably could decline to reward

10

Anderson's discovery recalcitrance with a lower punitive damages award, and in light of the undisputed evidence his holdings exceeded $30 million, the award was not excessive.

## III

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to his costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.


11